**HOWARD UNIVERSITY, Appellant,**

v.

**Sybil J. ROBERTS–WILLIAMS, Appellee.**

**Sybil J. Roberts–Williams, Appellant,**

v.

**Howard University, Appellee.**

**Nos. 10–CV–474, 10–CV–529.**

District of Columbia Court of Appeals.

Argued Sept. 21, 2011.

Decided Feb. 23, 2012.

Timothy F. McCormack, with whom Michelle M. McGeogh, Baltimore, was on the brief, for appellant/cross-appellee.

Woodley B. Osborne, with whom Robert B. Fitzpatrick and Daniel S. Kozma, Washington, were on the brief, for appellee/cross-appellant.

Before FISHER, Associate Judge, and STEADMAN and REID, Senior Judges.*

REID, Senior Judge:

Professor Sybil J. Roberts–Williams filed a lawsuit against her former employer, Howard University ("Howard"), after she was denied tenure as a faculty member in the Department of Theatre Arts. The jury returned a verdict in favor of Howard on three of the special verdict questions, but found that Howard had breached its contractual obligations to Professor Roberts–Williams "by failing to provide her with [1] written biennial evaluations ... [and (2) ] ... a statement of the reasons for the initial negative recommendations and [by] fail[ing] to allow two weeks to request reconsideration of the negative decision." The jury also determined that these breaches were "foreseeable and a substantial factor in the denial of tenure." The jury awarded Professor Roberts–Williams $250,060 "for loss of past earnings and benefits (BackPay)" and "$332,340 for loss of future earnings and benefits (Front Pay)."

Howard filed a post-trial motion for judgment as a matter of law, seeking reversal of that part of the jury verdict finding that it had breached its contract with Professor Roberts–Williams. The trial court set aside the jury verdict finding that Howard had breached the reconsideration contractual provision and entered judgment for Howard on that claim as a matter of law, but otherwise denied Howard's post-trial motion with respect to liability and damages. Both Howard and Professor Roberts–Williams filed appeals.

We affirm the trial court's judgment with respect to Howard's appeal. Because our decision does not alter the damages awarded to Professor Roberts–Williams, we need not reach the merits of her appeal.

---

* Judge Reid was an Associate Judge, Retired, at the time of argument. Her status changed to Senior Judge on December 12, 2011.

## FACTUAL SUMMARY

The record reveals that Howard hired Professor Roberts–Williams as a temporary lecturer in the Department of Theatre Arts in 1993. In 1998, she assumed the position of a tenure-track probationary instructor, and she became eligible to apply for tenure at any time during the following seven-year period.

The terms and conditions of her tenure track appointment were governed by Howard's faculty handbook. Sections 2 and 3 of the faculty handbook are incorporated into an employee's individual contract with Howard. Section 2.7.4 is devoted to tenure, and Section 2.7.4.6 sets forth the procedures for obtaining tenure approval at the department, school or college, and the university levels, as well as the timetable for tenure review. Section 2.7.6 includes the requirements for performance evaluations of faculty members.

Professor Roberts–Williams was promoted to assistant professor in 2001, but she did not apply for tenure at that point. On April 8, 2004, the Interim Chair of the Department of Theatre Arts, Professor Joe W. Selmon, sent a letter to her advising that she must apply for tenure during the 2004–2005 academic year. She submitted her application for tenure to the Department on October 15, 2004.[1] The application was reviewed by the tenured faculty of the Department, and on November 3, 2004, the Chairperson of the Department's Appointment, Promotion, and Tenure Committee ("APT"), Professor Sherill Berryman–Johnson,[2] sent her a list of 46 changes to be made in her application.

After she submitted a revised package to the Department's APT, Professor Berryman–Johnson sent her a letter on November 17, 2004, listing 7 changes to be made in her application package.

Professor Berryman–Johnson advised Professor Roberts–Williams on November 19, 2004, that the APT vote was "three votes yes and three votes no," but on November 22, Professor Berryman–Johnson sent "a corrected letter" indicating that there were "two votes yes, three votes no, and one abstention." In a letter dated that same day, Professor Selmon informed Professor Roberts–Williams that she could "submit a written request for reconsideration by November 26, 2004." Neither Professor Berryman–Johnson's nor Professor Selmon's letter explained the reasons for the denial of the tenure application, or why Professor Roberts–Williams was given only three or four days within which to file her request for reconsideration, or why she had to file for reconsideration before being told of the reasons for the denial of tenure. Professor Roberts–Williams sought reconsideration on November 29, 2004.

In response to her reconsideration request, Professor Berryman–Johnson wrote separate letters to Professor Roberts–Williams and Professor Selmon on December 1, 2004, stating the APT's unanimous recommendation that Professor Roberts–Williams be retained in the Assistant Professor position "for the academic year 2005–2006." The reason for this recommendation was to permit Professor Roberts–Williams to "receive active clarity and support from senior faculty members as

---

1. Professor Roberts–Williams experienced complications with her pregnancy on October 18, 2004, and was taken to the hospital where she gave birth to a daughter, by Cesarean Section. The infant succumbed after two days. The doctors informed Professor Roberts–Williams that she needed six to eight weeks to recuperate at home. She claimed

that Howard required her to teach her courses on line during her recuperation period.

2. The record is inconsistent as to whether Professor Berryman–Johnson has a hyphenated last name. For consistency in this opinion, we use "Berryman–Johnson."

well as additional time to thoroughly address the depth and quality of her work." In a letter dated December 16, 2004, Professor Selmon notified Professor Roberts–Williams that: "The Committee and the Chair recommend that you be granted a special appointment for the coming 2005–2006 academic year at the rank of Lecturer." The special appointment was to be her "final appointment."

Dr. Berryman–Johnson's December 20, 2004 letter to Professor Roberts–Williams explained the reasons for the negative tenure decision. Central to the negative decision was the quantity of Professor Roberts–Williams' publications; her main scholarly work was her *Mumia* Project[3] and the explanatory letter stated:

> Although the *Mumia* Project is a good example of publication sources, the candidate does not seem to have many other major publications/articles during the time period other than for departmental production programs and articles related to *Mumia*. The weight of the publications are not with enough volume of material that would be commensurate for a promotion to Associate Professor.

While the evaluation of her teaching ranged from "average to excellent," the letter indicated that "some students reported confusion regarding [Professor Roberts–Williams'] methodology." One evaluator believed "that a doctorate is required." The letter praised Professor Roberts–Williams as a "dramaturg[e]" or playwright, but expressed concern about her "collegiality" due to her "limited support in attending departmental productions."[4]

Dean Tritobia Hayes–Benjamin, Associate Dean of the College of Arts and Sciences, Division of Fine Arts, supported the Department's recommendation that Professor Roberts–Williams be retained as a Lecturer through May 15, 2006. However, Howard's Provost and Chief Academic Officer, Dr. Richard A. English, determined on May 23, 2005, that the faculty handbook precluded an additional year for Professor Roberts–Williams, and that she could only "permit her application for promotion and tenure to proceed or accept the 2004–05 academic year as her final one as a member of the faculty."

Dean Hayes–Benjamin also supported the recommendation of the Division of Fine Arts that Professor Roberts–Williams be allowed to withdraw her tenure application and to resubmit it in Fall 2005. Dr. English rejected this recommendation based upon the above interpretation of the faculty handbook.

Later, on December 2, 2005, Provost English recommended that the President, H. Patrick Swygert, not approve Professor Roberts–Williams for promotion with tenure. On January 4, 2006, Dean James Donaldson, Dean of the College of Arts and Sciences, notified Professor Roberts–Williams that the President did not approve her promotion with tenure.

---

**3.** The *Mumia* Project was a body of work that examined the life of Mumia Abu–Jamal, a man who was on death row, as well as the death penalty and the criminal justice system in general. As part of this project, Professor Roberts–Williams developed several plays and performance pieces, including "Hearing the Voice: Mumia Abu–Jamal," "A Liberating Prayer: A Love Song for Mumia," and "Discovering Mumia." She also contributed a scholarly article to "August Wilson and the Black Aesthetic," which explored African-American theater. Professor Roberts–Williams urged the committee to consider each piece of work related to the project as a separate item, even though the works could arguably be viewed as only one project.

**4.** Professor Roberts–Williams wrote an extensive letter on January 3, 2005 (inadvertently, the year appearing on the actual letter was 2004), explaining the uniqueness of the *Mumia* Project, and defending herself against other criticisms.

Professor Roberts–Williams filed a four-count complaint against Howard on December 29, 2006. Counts I to III alleged violations of the District of Columbia Human Rights Act ("DCHRA"): gender discrimination, pregnancy discrimination, and discrimination on account of family responsibilities. Count IV asserted a breach of contract claim for alleged violations of Howard's faculty handbook, including: (1) failure to provide the required biennial evaluations, counseling, and guidance ("biennial evaluations"); (2) failure to implement the proper reconsideration procedure after the Department's denial of the tenure application ("reconsideration"); and (3) failure to provide information about the criteria used to review the tenure application ("criteria").

The trial lasted approximately eight days. The witnesses generally provided testimony regarding Howard's tenure process and Professor Roberts–Williams' efforts to gain tenure, as recounted in this factual summary. There also was expert testimony regarding tenure procedures, as well as Professor Roberts–Williams' alleged damages. In addition to herself, Professor Roberts–Williams called as witnesses Dean Hayes–Benjamin, Professor Selmon, Dean Donaldson, and expert witnesses Richard Lurito and Caleen Jennings; Professor Berryman–Johnson's deposition was read into evidence. Howard also presented as its witnesses Dean Hayes–Benjamin and Professor Selmon, as well as Professor George Epting (a tenured professor in the Department of Theatre Arts and a member of the Depart-ment's APT); and Thomas Borzilleri, an economist and expert. The jury rejected Professor Roberts–Williams' DCHRA claims, but found Howard liable for two of the breach of contract claims (biennial evaluations and reconsideration), and awarded Professor Roberts–Williams damages. The trial court set aside the verdict as to one of the breach of contract claims (reconsideration), but that action did not affect the total amount of damages awarded by the jury. Both Howard and Professor Roberts–Williams noted appeals.

Two provisions of the faculty handbook are at issue in these appeals: Section 2.7.6 governing biennial performance evaluations of faculty members, and Section 2.7.4.6.1 as it relates to reconsideration of a negative departmental tenure decision. The pertinent part of Section 2.7.6 provides that: "Each member of the faculty holding a temporary, probationary or tenured appointment, whether full or part-time, shall be evaluated at least every 2 years"; and further, that: "When a faculty member is being considered for ... tenure, the evaluation file for the relevant time period shall be a primary source of data on which such decision [is] made." The reconsideration provision of Section 2.7.4.6.1 specifies, in part, that: "Any faculty member who is reviewed for and denied a positive recommendation for tenure may ask for reconsideration of that decision at the department level." The department must inform the candidate of the reconsideration "right and the procedures for exercising it when [the candidate] is first notified of a negative tenure decision." The reconsideration procedures are specific.[5] The jury found that Howard had

---

5. With respect to the details of the reconsideration provision, Section 2.7.4.6 provides:

 Within 2 academic weeks after being notified that the departmental decision is negative and prior to referral to the dean, the candidate will receive a written statement of the reasons for the negative decision, unless the candidate expressly relinquishes his/her right to receive the statement within 2 academic weeks of said notice. The statement shall respect the limits set by the need to preserve confidentiality. If the candidate wishes to have the department decision reconsidered, he/she shall respond to the

breached both of these provisions. The trial court denied Howard's post-verdict motion with respect to Section 2.7.6. The court also determined that the jury correctly found that Howard breached Section 2.7.4.6.1, but that Professor Roberts–Williams could not prevail on the reconsideration claim because even if Howard had followed the reconsideration procedure, she would not have had enough time to overcome the department's determination that her scholarly work was "quantitatively inadequate" for tenure.

## ANALYSIS

### Howard's Appeal

### The Interim and Final Jury Instruction on Biennial Evaluations

Howard primarily contends that the trial court abused its discretion by giving an interim or special instruction pertaining to biennial evaluations, and also erred as a matter of law regarding the content of the biennial evaluation jury instruction. Professor Roberts–Williams supports the interim or special instruction, as well as the final jury instruction regarding biennial evaluations.

### Factual Context for the Biennial Evaluation Instruction

One of Professor Roberts–Williams' breach of contract claims was that she did not receive the required biennial evaluations specified in the faculty handbook; her trial testimony during direct examination reiterated that claim. During her extensive cross-examination, Howard's counsel sought to show that she had indeed received evaluation of her performance at Howard. Using her deposition transcript,

counsel established that he had asked whether Professor Roberts–Williams ever went to anyone to ask how she was doing. She responded at the deposition, in part: "I went to my colleagues and I talked quite a bit. Dr. Berryman–Johnson was always available for feedback...." When questioned further at trial, Professor Roberts–Williams stated: "I would agree that she [Dr. Berryman–Johnson] was always available for feedback of a certain kind, yes." She also agreed that she had received feedback from another professor. Howard's counsel next focused on Professor Roberts–Williams' 2001 application for promotion to assistant professor and asked whether section 4 of that application did not contain an evaluation by the College APT in the areas of her teaching, research and publications, professional development, and service. Professor Roberts–Williams agreed that section 4 and other sections of her 2001 application for promotion did contain evaluation material. Counsel for Professor Roberts–Williams raised an objection on the ground that Howard's counsel was "equating" the promotion application evaluation with the required handbook evaluations; that "the question implies they're the same thing, and they're not."

The record shows that the trial court first alerted counsel for Howard and Professor Roberts–Williams (at the beginning of the third day of Professor Roberts–Williams' testimony and before the continuation of her cross-examination by Howard's counsel), that it was "going to instruct the jury that as a matter of law, under the contract between the parties pursuant to the handbook, the university

chair in writing within 2 academic weeks of receipt of the department's statement of reasons. The candidate may address any issue in writing that he/she deems appropriate, and may present new information. The tenured faculty shall consider the candidate's response, and a second vote shall be taken. The final department decision and the reasons for it shall be provided in writing to the candidate within 3 academic weeks of receipt of the candidate's response.

has an affirmative obligation ... to conduct biennial evaluations." Howard's counsel objected. The trial court allowed the cross-examination of Professor Roberts–Williams to continue, and during the mid-morning recess, the court invited counsel for Howard to explain his objection. Counsel stated that the instruction "should be given at the end" of the case, that "it improperly takes certain matters out of the province of the jury," that it would "unduly influence the jury," and that the jury would "begin to believe that the [c]ourt is favoring the plaintiff in this case."

The trial judge responded, in part: "Right now, the jury may feel that the plaintiff ... had the opportunity to seek evaluations from Dr. Berryman–Johnson and other members of the faculty, and that ... these evaluations were open to her and she didn't take advantage of [them]." However, the judge continued, "the handbook, which is a contract, states ... that there shall be biennial evaluations, and that they should be shared with the faculty member, and that the faculty member should have access to the evaluation." Howard's counsel pressed the points that "[t]here is absolutely no evidence ... that there is any confusion among the jurors"; and that Howard "substantially complied with the contract," that "[i]t is going to be extremely prejudicial to the university if the [c]ourt gives this instruction at this time." Cross-examination of Professor Roberts–Williams then resumed.

At the end of the cross-examination and redirect examination of Professor Roberts–Williams, the trial judge proceeded to instruct the jury, in part, as follows:

Section 2.1 [of the faculty handbook] ... states that Sections 2 and 3 are part of the contract between the university and the faculty member. . . .

Now, Section 2.7.6 ... [is] part of that contract. . . . And 2.7.6 has to do with performance evaluation of all faculty. . . .

[T]he gist [of that provision] is that the university undertakes to give biennial evaluations, to evaluate the faculty member every two years, and it explicitly mentions tenure being benefitted by the biennial evaluations for those on the tenure track, as was the plaintiff. And it also requires that the chairperson of the department discuss the evaluation that's made with a [tenure] candidate. That is part of the contract that the plaintiff had with the defendant, Section 2.7.6.

Now, you're further instructed ... that although a candidate for tenure may have available, colleagues to reach out [to] for advice and counsel with respect to tenure and the applications for tenure, that doesn't relieve the university of its contractual duty to biennially evaluate the candidate. . . .

The trial court discussed proposed final instructions with the parties. While the court was prepared to give an instruction regarding Howard's substantial performance with respect to breach of contract as to "criteria and standards,"[6] the court declined to give a substantial performance instruction with respect to the biennial evaluations and the reconsideration breach of contract claims, because there was "no factual predicate as a matter of law for substantial performance" as to the biennial evaluations, and because there was "no

---

**6.** The trial court's substantial performance instruction with respect to providing notice to Professor Roberts–Williams concerning the criteria and standards to be used in evaluating her tenure application read as follows: "I instruct you that any document or documents placed in [Professor Roberts–Williams' mailbox at the department would constitute sufficient delivery to [her] of the information contained therein."

dispute that the reasons for the denial [of tenure] were not presented to [Professor Roberts–Williams] before she was required to seek reconsideration." The trial court's final breach of contract jury instructions, given on September 25, 2009, generally reflected the handbook contractual language, and the biennial evaluation instruction mirrored the interim or special instruction in large measure.[7]

After having concluded his final instructions to the jury, the trial judge invited both counsel to the bench and inquired as to any objections. Counsel for Howard raised objections concerning instructions relating to the DCHRA claims, and counsel for Professor Roberts–Williams posed an objection to an aspect of the pregnancy discrimination instruction. Without further explanation, counsel for Professor Roberts–Williams asserted: "And our earlier objections are already noted." On September 24, 2009, during the discussion of proposed final instructions, counsel for Howard objected to an instruction which "combin[ed] the biennial evaluations and the criteria [for tenure]" as "confusing to the jury." He also renewed his objection to the interim or special instruction regarding biennial evaluations, which would be restated in the final instructions. Counsel's other objections were devoted to instructions pertaining to the DCHRA claims and to damages.

## Legal Principles Applicable to the Jury Instruction Issue

■■■ "A trial court has broad discretion in fashioning appropriate jury instruc-

---

7. The breach of contract final instruction declared, in part:

It is undisputed ... that the relevant provisions of the university's handbook constitute a contract. A contract is an agreement between two or more parties to do or not to do something. There is no dispute that plaintiff and defendant had an employment contract.... Under the law, if one party without legal excuse fails to fully perform a duty under the contract, then that party has breached the contract.

If you find that the defendant breached the contract, then the defendant is liable to the plaintiff for damages.

Now, Howard University's faculty handbook contains policies and practices which the university makes known to its faculty members and which govern their employment relationship. Each faculty member has a legitimate expectation that these policies and practices will be followed. If the university fails to follow the policies and practices contained in the faculty handbook, or if it violates its requirements, then it has violated its contract of employment with the faculty member, and it is liable to the faculty member for any damages resulting from the violation or violations.

. . . .

It is up to you to determine whether or not the evidence establishes these various breaches by a preponderance. And if so, whether the breaches constitute an unjustified failure to perform all or any part of what was promised in plaintiff's contract with the university.

. . . .

I want to repeat to you an instruction I gave you during the trial dealing with biennial evaluations.... The requirement of biennial evaluations ... [is a] contractual requirement[ ]. The fact that the tenured faculty members may be available for the candidate to reach out to for advice or coun[se]l ... does not relieve the university of its contractual duties....

And now I will continue by explaining the last breach of contract claimed by the plaintiff. And that is whether the defendant complied with the provisions of Section 2.7.4.6.1 ... of the faculty handbook, which provides that the tenure candidate is to be provided with a written statement of the reasons for the initial negative recommendation by the Department APT Committee and allow two weeks thereafter to request reconsideration of the negative decision and to present new information in support of her candidacy.

If you determine that the defendant failed to adhere to its contract with the plaintiff in any of the respects that I have just outlined, you should find for the plaintiff on that breach and should then consider the issue of damages respecting that breach....

tions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 625 (D.C. 1986). Furthermore, the trial court's decision to issue or to refuse to issue instructions should result from "an informed choice among permissible alternatives, which is the essence of an appropriate exercise of discretion." *Nelson v. McCreary*, 694 A.2d 897, 901 (D.C.1997) (citing *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979)). A trial court abuses its discretion regarding jury instructions when the "stated reasons do not rest upon a [sufficient] factual predicate." *Id.* (alteration in original) (internal quotation marks omitted). In addition, a party is entitled to an instruction on his or her theory of the case as long as the requested instruction finds support in the evidence. *Id.* (citing *Nimetz v. Cappadona*, 596 A.2d 603, 605 (D.C.1991)). In reviewing the trial court's denial of a requested instruction on a party's theory of the case, we view the evidence in "the light most favorable" to appellant. *Id.* (citing *Wilson v. United States*, 673 A.2d 670, 673 (D.C. 1996)).

▪▪ With respect to contract issues relating to the jury instructions, we are mindful of the following principles. "'[C]ourts should not invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment, promotion, and tenure, especially in institutions of higher learning.'" *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006) (quoting *Brown v. George Washington Univ.*, 802 A.2d 382, 385 (D.C.2002)). However, "'[t]he principle of academic freedom does not preclude [the court] from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract.'" *Id.*

(second alteration in original). "[I]f the meaning of a contract is so clear that reasonable [persons] could reach but one conclusion or no extrinsic evidence is necessary to determine the contract's meaning, then contract interpretation is a matter for the court." *Howard Univ. v. Best*, 484 A.2d 958, 966–67 (D.C.1984) (*Best I* ). But, "[t]he objective view of contract interpretation adopted in this jurisdiction requires, in the context of University employment contracts, that the custom and practice of the University be taken into account in determining what were the reasonable expectations of persons in the position of the contracting parties." *Brown, supra*, 802 A.2d at 386 (internal quotation marks omitted). In that regard, university contracts "are to be read [ ] by reference to the norms of conduct and expectations founded upon them in a particular manner, unlike, to some degree, contracts made in the ordinary course of doing business." *Id.* (internal quotation marks omitted). "In order for a custom and practice to be binding on the parties to a transaction, it must be proved that the custom is definite, uniform, and well known, and it must be established by clear and satisfactory evidence." *Howard Univ. v. Best*, 547 A.2d 144, 151 (D.C.1988) (*Best II* ) (internal quotation marks omitted).

We now turn to an analysis of Howard's specific contentions pertaining to the trial court's biennial evaluations instructions. Howard maintains that the jury's finding that its "failure to provide [Professor] Roberts–Williams with written and signed biennial evaluations proximately caused [her] damages ... is a direct result of the prejudicial instructions given by the trial court at the end of [Professor] Roberts–Williams' testimony and again at the close of the evidence." Howard claims that: "The [c]ourt's instruction alleviated [Professor] Roberts–Williams' burden of proving her case with respect to the alleged

failure to evaluate her." In addition, Howard argues that: "[T]he trial court's special instruction deprived the University of an ability to establish that it had substantially complied with the Faculty Handbook by affording [Professor] Roberts–Williams other, alternative means of feedback and evaluation which were the equivalent of the biennial evaluations." Howard asserts that "the instruction was improper in light of the statute of limitations imposed on [Professor] Roberts–Williams' claim of breach of contract," that she can only make a claim for 2004, and that a 2004 evaluation would not have "changed the university's decision to deny tenure."

We disagree with Howard's assertion that the trial court's biennial evaluations instructions were "prejudicial." First, we conclude that the trial court did not abuse its broad discretion to give an interim or special instruction at the conclusion of Professor Roberts–Williams' testimony. Given Howard's cross-examination of the professor, which sought to show that she had received evaluations and had an opportunity to seek feedback from at least two professors, the judge expressed the belief that the jury might draw the wrong conclusion and the judge stated reasons, based upon a factual predicate, for giving the interim or special instruction. *See Allen, supra,* 509 A.2d at 625; *Johnson, supra,* 398 A.2d at 364. Second, the trial court's interim or special instruction accurately reflected the fact that Howard's faculty handbook's provisions regarding tenure constituted part of an employee's contract. Those contractual provisions, as the trial court properly concluded, are not ambiguous, and the trial court's interim or special and final biennial evaluations instructions properly informed the jury as to their meaning. *See Best I, supra,* 484 A.2d at 966–67. Third, we cannot agree that the trial court's instructions lifted the burden from Professor Roberts–Williams to prove her case "with respect to the

alleged failure to evaluate her." In its final instructions, the trial court carefully instructed the jury on the burden of proof, indicating that Professor Roberts–Williams had the burden of proving "every element of her claim by a preponderance of the evidence"; that the jury must "determine whether or not the evidence establishes the[ ] various breaches by a preponderance of the evidence, [a]nd if so, whether the breaches constitute an unjustified failure to perform all or any part of what was promised in [Professor Roberts–Williams'] contract with [Howard]"; and that "[t]he burden of proof is upon [Professor Roberts–Williams] to establish all of the elements of her damages by a preponderance of the evidence."

Fourth, the record does not support Howard's contention about the impact of the special instruction on Howard's ability to establish substantial compliance with the contractual biennial evaluation requirement. The trial court clearly was familiar with this court's decision in *Allworth, supra,* which reiterated the caution against the court's involvement in university promotions and tenure, but which nevertheless recognized that the court could address "the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract." *Id.* at 202. The trial court understood that Howard's proof, with respect to Professor Roberts–Williams' claim that it failed to provide information about the criteria used to review her tenure application, established a factual basis for making a substantial performance defense; and hence, the court exercised its discretion and gave instructions relating to that defense. In that regard, Howard did not offer proof of a factual basis for a substantial performance defense with regard to Professor Roberts–Williams' biennial evaluations claim. Our case law emphasizes that in construing and applying university contracts, the court

must consider "the custom and practice" of the university, but "[i]n order for a custom and practice to be binding on the parties to a transaction, it must be proved that the custom is definite, uniform, and well known, and it must be established by clear and satisfactory evidence." *Best II, supra,* 547 A.2d at 151.

Even assuming, without deciding, that Howard properly preserved its substantial compliance contention, the record does not reflect "clear and satisfactory evidence" of Howard's custom and practice of accepting something short of an actual biennial evaluation in satisfaction of Section 2.7.6 of the Faculty Handbook. The true issue is not whether Howard substantially complied with its obligation to provide biennial evaluations, but whether its failure to do so caused Professor Roberts–Williams more than nominal damages. The trial court's cogent analysis of the "sufficiency of causation evidence as to the evaluations" (in resolving Howard's post trial motion for a new trial or judgment as a matter of law), demonstrates that the jury's findings— that Howard breached the biennial evaluations provision of its contract with Professor Roberts–Williams, and that this breach was both "foreseeable and a substantial factor in the denial of tenure"—are supported by ample record evidence.[8]

### Professor Jennings' Expert Testimony

Howard contends that Caleen Jennings, a Professor of Theatre and Co–Chair of the Department of Performing Arts at The American University in the District of Columbia, and a member of American's Department of Performing Arts Rank and Tenure Committee since 1997, "was not qualified to testify as an expert on [Howard's] adherence to its rules, regulations and faculty handbook." Howard claims that Professor Jennings "was [ ] permitted to testify far beyond the scope permitted by [another judge] and the trial court's orders." Howard specifically objects to the trial court's allowing the professor to respond to the following question from Professor Roberts–Williams' counsel: "What [e]ffect will Howard University's denial of tenure to [P]rofessor [Roberts-]Williams have on her ability to obtain a tenure track position at ... another institution of higher learning?"

Approximately one year prior to trial, on September 12, 2008, Professor Roberts–

---

**8.** We doubt that Howard has preserved its statute of limitations argument with respect to the biennial evaluations instructions, but even assuming that it has, we are satisfied that Howard could not prevail on this argument. Howard's appellate argument on the statute of limitations issue is contained in one relatively short paragraph of its main brief, and neither in its main brief nor in its reply brief does Howard address the trial court's specific analysis of the issue. The record shows that the trial court addressed the statute of limitations issue during arguments on Howard's directed verdict motion on September 22, 2009. The court concluded that "since there was a continuous duty [to provide the biennial evaluations], each violation refreshes those previous biennials that were not given." The trial court cited *Paul v. Howard Univ.,* 754 A.2d 297, 312 (D.C.2000), for the "continuous duty." Howard takes no issue with the appli-

cation of this doctrine to the instant case. Nor does Howard make any explicit argument that Professor Roberts–Williams had a duty to protest the absence of the biennial evaluation on its first non-occurrence, or affirmatively seek out substitute evaluations and prospects for tenure on her own. Nor did Howard establish that, perhaps by way of mitigation or defense, Professor Roberts–Williams had a duty by custom and practice or otherwise apart from the contract to protest the absence of the biennial evaluation on its first non-occurrence (section 2.8.4 of the handbook, pertaining to appeal of a negative decision regarding tenure, by its very terms was inapplicable), or affirmatively seek out substitute evaluations and prospects for tenure on her own beyond that shown in the record. Therefore, we express no views on the merits of these possible issues.

Williams sent Howard an amended Super. Ct. Civ. R. 12(b)(4) statement in which she identified Professor Jennings as one of her expert witnesses. The amended statement indicated, in part, that Professor Jennings "will ... offer her opinion on Howard University's established tenure process and procedures, and the importance of Howard University's failures to comply with its tenure procedures" and that "Professor Jennings will ... give an opinion that Howard University's denial of tenure to Professor Roberts–Williams will have a substantial and adverse effect on her ability to obtain a tenure track position in her field at another institution." Howard filed a motion *in limine* seeking to exclude testimony "challenging tenure denial." The Honorable Jeanette J. Clark issued an order on December 9, 2008, specifying that:

> Expert witnesses' testimony shall be allowed only to the extent that the testimony relates to the process and procedures regarding tenure and [Howard's] adherence or not to its rules, regulations, and faculty handbook. Expert[ ] witnesses may not testify as to the ultimate decision of tenure and whether Howard University should have promoted [Professor] Roberts–Williams.

Professor Jennings executed a sworn declaration on December 15, 2008, setting forth her background[9] and her opinions, including her opinion about the impact of Howard's denial of tenure on Professor Roberts–Williams' ability to find a tenure track position elsewhere.

Over the objection of Howard, the Honorable Leonard Braman, who presided over the trial in this case, qualified Professor Jennings as an expert in "the process and procedures regarding tenure." Judge Braman generally overruled Howard's objection that certain questions were beyond the scope of Judge Clark's ruling, but he precluded questions that required Professor Jennings to testify "as to the ultimate decision on tenure." Among the questions to which Howard raised an objection was the following:

> What [e]ffect will Howard University's denial of tenure to Professor Williams have on her ability to obtain a tenure track position at ... another institution of higher learning?

Professor Jennings replied:

> It's a huge impact, it's devastating. Once you've been denied tenure someplace it's ... extraordinarily hard to get a teaching job but to get a tenure track job, it's extraordinarily difficult.

■■■■ We review a trial judge's decision to admit or exclude expert testimony for abuse of discretion. *See Benn v. United States,* 978 A.2d 1257, 1269 (D.C.2009). "Whether a witness possesses the requisite qualifications to express an opinion on a particular subject is within the trial court's discretion, and its decision in that regard will only be reversed for an abuse." *Jung v. George Washington Univ.,* 875 A.2d 95, 105 (D.C.), (internal quotation marks omitted), *amended on reh'g,* 883 A.2d 104 (D.C. 2005). In light of Professor Jennings' background and substantial experience on American's Department of Performing Arts Rank and Tenure Committee, as well as her experience as an outside evaluator

---

9. Professor Jennings had been a Professor of Theatre at American since 1989, and at the time of her declaration was Co–Chair of the Department of Performing Arts. She was granted tenure in 1997, and she became a member of the Department of Performing Arts Rank and Tenure Committee. She served as chairperson of that committee for four years. She had been designated as a pre-tenure or promotion external evaluator for theatre programs at various institutions, including U.C.L.A. and William and Mary. In addition to her work at American, she is a playwright, director and performer, and has received awards for her work.

for tenure and promotion candidates at other institutions, we see no abuse of discretion in Judge Braman's ruling that she was qualified as an expert on process and procedures regarding tenure, and that she could respond to questions about Howard's tenure process and procedures.

 We also reject Howard's contention that the trial court improperly permitted Professor Jennings to testify beyond the scope permitted by Judge Clark's order. Generally, "[u]nder the 'law of the case' doctrine, a trial judge presiding over later phases of a proceeding is bound by an earlier final ruling by a judicial colleague, unless new facts have arisen in the interim." *In re Barlow*, 634 A.2d 1246, 1248 n. 3 (D.C.1993). However, "rulings on motions *in limine* normally are considered provisional, in the sense that the trial court may revisit its pre[-]trial evidentiary rulings in the context of the presentation of the evidence in the case." *Jung*, 875 A.2d at 103, (internal quotation marks omitted), *amended on reh'g*, 883 A.2d at 105. Here, as Judge Braman determined, Judge Clark's order was directed at the liability phase of the case, not damages; moreover, nothing precluded Professor Jennings from testifying about other matters within her expertise, so long as she did not attempt to offer an opinion about "the ultimate decision on tenure." Furthermore, Howard knew at least one year before trial that Professor Jennings would offer an opinion that Howard's denial of tenure to Professor Roberts–Williams would have "a substantial and adverse effect on her ability to obtain a tenure track position in her field at another institution." Therefore, Howard could not have been surprised about Professor Jennings' testimony, and Howard could have designated its own expert to counter Professor Jennings' testimony relating to Professor Roberts–Williams' economic damages.

### Professor Roberts–Williams' Duty to Mitigate Damages

 Howard complains about the trial court's instruction to the jury concerning mitigation of damages. During final jury instructions, the trial court told the jury that Professor Roberts–Williams was required to "do all that is reasonably within [her] power to minimize her losses," but that she was not required to accept "lesser employment." Howard argues that this instruction, as applied to the breach of contracts claims, was improper. We disagree.

 "A trial court generally has broad discretion in fashioning jury instructions, as long as the charge, considered as a whole, fairly and accurately states the applicable law." *Holloway v. United States*, 25 A.3d 898, 903 (D.C.2011) (internal quotation marks omitted). Because the question here is legal, we review the instruction *de novo. Appleton v. United States*, 983 A.2d 970, 977 (D.C.2009). An award of damages is subject to the defense of mitigation of damages. *District of Columbia v. Jones*, 442 A.2d 512, 524 (D.C. 1982). The burden is on the employer to show that the employee "has obtained a substitute job, or could obtain one by reasonable effort." *Id.* (internal quotation marks omitted); *see Kakeh v. United Planning Org., Inc.*, 587 F.Supp.2d 125, 129 (D.D.C.2008) ("the only issue ... is whether an employee made responsible and diligent efforts to obtain a similar employment opportunity").

In *Best I, supra*, a case involving breach of contract and other claims by a professor, the trial judge refused to instruct the jury that the professor "had a duty to accept lesser employment after an extended period of unemployment." *Id.* at 976 n. 18. We concluded that there was no error in that instruction. *Id.* (citing, *inter alia*, *Jones, supra*, 442 A.2d at 524). Howard

argues in a footnote that "[t]his instruction was never adopted by *Best.*" Even assuming, without deciding that Howard preserved this specific instructional issue, we are convinced that the trial court correctly instructed the jury both in *Best* and in this case.

Howard had the burden of asserting and proving its affirmative defense regarding mitigation of damages. It cites no persuasive case law for the proposition that the specified trial court instruction in this case constituted an error of law. Other jurisdictions have concluded that in a specialized field such as education, a plaintiff is not required to mitigate damages by accepting lesser employment, or employment outside of the educational field. In *Selland v. Fargo Pub. Sch. Dist. No. 1,* 302 N.W.2d 391, 393 (N.D.1981), the court determined that: "In order to mitigate damages, a teacher is not required to seek employment in another line of service other than teaching," or "to go to a different locality." *Id.* (citations omitted). *See also McDowell v. Napolitano,* 119 N.M. 696, 895 P.2d 218, 225 (1995) (denial of tenure; general instruction on mitigation sufficient); *Frye v. Memphis State Univ.,* 806 S.W.2d 170, 173 (Tenn.1991) (employee not required to accept just any job or to abandon his home, "but is only required to exercise reasonable diligence in seeking other employment of a similar or comparable nature"); *Kenaston v. School Admin. District #40,* 317 A.2d 7, 10 (Me.1974) ("A teacher whose contract has been unjustifiably terminated is not required to accept employment which would be of an inferior or different kind ... in order to mitigate damages."); *Zeller v. Prior Lake Pub. Schs.,* 259 Minn. 487, 108 N.W.2d 602, 606 (1961) ("Ordinarily, a teacher under contract wrongfully discharged need not ac-

cept employment of a different or inferior kind or in a different locality in order to mitigate damages.").

Moreover, the court in *Higgins v. Lawrence,* 107 Mich.App. 178, 309 N.W.2d 194 (1981), a case pertaining to an employment contract, declared that "[a] wrongfully discharged employee is obligated to mitigate damages by accepting employment of a 'like nature.'" *Id.* at 196. The court set forth as "criteria for determining 'like nature'" the following: "the type of work, the hours of labor, the wages, tenure, working conditions, etc.," and asserted that: "Whether or not an employee is reasonable in not seeking or accepting particular employment is a question for the trier of fact." *Id.* at 196 (citing Restatement (Second) of Agency, § 455, cmt. d at 373; Restatement of Contracts § 336 at 537; 11 Williston on Contracts § 1359 at 306 (3d ed.1959)); *see also Hussey v. Holloway,* 217 Mass. 100, 104 N.E. 471, 473 (1914) ("[I]t has generally been held that where, as in this case, a plaintiff was employed in a special service, she is not obligated to engage in a business that is not of the same general character, in order to mitigate the defendant's damages."). Under these authorities, Howard's complaint that Professor Roberts–Williams "had not looked for employment other than as a professor or anywhere outside of the Washington Metropolitan area," is not a ground on which we can reverse the judgment of the trial court.[10] The "lesser employment" instruction was not an abuse of the trial court's discretion, and it was up to the jurors, as fact finders, to determine whether Professor Roberts–Williams exercised reasonable diligence in seeking other employment. In short, we see no instructional error.

**10.** Howard did not request an instruction concerning Professor Roberts–Williams' obligation to seek similar employment outside of the Washington Metropolitan area. Hence it has waived that issue.

*Professor Roberts–Williams' "Colston Argument"*

During closing argument, counsel for Professor Roberts–Williams asked the jury, "How much is her damaged career and professional reputation worth? Is it $300,000, $500,000, $800,000? That is for you to decide." Howard asserts that the argument, known as a "Colston argument," was improper.

In *Colston*, a case for false arrest and assault and battery where the appellee was blinded, appellee's counsel argued to the jury, "Is an eye worth five hundred thousand? Eight hundred thousand? A million? That is for you to say. That is for you to decide." *District of Columbia v. Colston*, 468 A.2d 954, 956 (D.C.1983). We determined there was no *per se* error in the argument. *Id.* at 957–58. Although an attorney may not ask the jury to step into he victim's shoes or suggest a specific dollar amount to the jury, "counsel must always be permitted to argue that his client's case is a serious one and to stress those aspects of the case that contribute to its seriousness." *Id.; see also Hechinger Co. v. Johnson*, 761 A.2d 15, 21 (D.C.2000).

In this case, the jury only awarded damages for breach of contract, and the court specifically instructed that "damages for pain and suffering, mental anguish, humiliation or embarrassment [could not] be awarded for any breach of contract claimed." The award of damages was based, rather, on calculations of back pay and front pay. There is no reason to think that the *Colston*-type argument affected the determination of damages in any way.

Furthermore, Professor Roberts–Williams' attorney did not suggest a specific amount. In fact, "[t]here is no material difference between the dollar figure argument sanctioned in *Colston* and the one that [Professor Roberts–Williams'] counsel made in this case." *Hechinger*, 761 A.2d at 22. Hence, we reject Howard's contention.

*Howard's Motion for Judgment as a Matter of Law*

Howard finally claims that the trial court erred by denying, in part, its motion for judgment as a matter of law or a new trial. This court reviews the trial court's decision to grant or deny a motion for judgment as a matter of law *de novo*. *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr.*, 957 A.2d 890, 902 (D.C.2008). "A trial court may grant a motion for judgment as a matter of law 'only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor.'" *Id.* (quoting *Liu v. Allen*, 894 A.2d 453, 459 n. 10 (D.C.2006)). A judgment as a matter of law should be granted "only in extreme cases." *Lyons v. Barrazotto*, 667 A.2d 314, 320 (D.C.1995). "If it is possible to derive conflicting inferences from the evidence, the trial judge should allow the case to go to the jury." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C.2002) (quoting *Pazmino v. Washington Metro. Area Transit Auth.*, 638 A.2d 677, 678 (D.C.1994)) (internal quotation marks omitted).

Howard argues that the jury and the trial court failed to give proper academic deference to Howard's decision to deny tenure. As we said earlier, "courts generally give deference to the discretion exercised by university officials," but "[t]his is not to say that a court may never examine university promotion and tenure decisions." *Allworth, supra*, 890 A.2d at 202. We must avoid "substitut[ing][our] judgment improperly for the academic judgment of the school." *Id.* (internal quotation marks omitted). "[W]here a university or college has adopted tenure and promotion rules or contract provisions, a court may determine whether there has

been substantial compliance with those rules." *Id.* Most importantly, "[t]he principle of academic freedom does not preclude [the court] from vindicating the contractual rights of a plaintiff who has been denied tenure in breach of an employment contract." *Id.* (alteration in original) (quoting *Craine v. Trinity Coll.*, 259 Conn. 625, 791 A.2d 518, 540 (2002)) (internal quotation marks omitted).

■ According to Howard, there was no evidence that Professor Roberts–Williams would have been granted tenure but for its failure to provide a proper biennial evaluation.[11] But, this was not the question submitted to the jury. The jury properly was asked to determine whether a breach or breaches of the contract "were a substantial factor in causing the denial of tenure" and whether such a result was a reasonably foreseeable consequence of a breach. Howard cited Professor Roberts–Williams' emphasis on only one project, the *Mumia* Project, as insufficient scholarship. Because Professor Roberts–Williams did not receive a proper formal evaluation, no other faculty members ever advised her that such focus on a single work would impact her tenure application negatively. A reasonable jury could conclude that Professor Roberts–Williams would have approached her scholarly work and her tenure application differently if she had known that the *Mumia* Project would be considered insufficient. In other words, a reasonable jury could conclude that the failure to give biennial evaluations was "a substantial factor in causing the denial of tenure."

Howard also maintains that in light of Judge Braman's decision to grant judgment as a matter of law with respect to the notification provision, the damages award must be lowered. Howard contends that the award was likely influenced by the jury's finding that Howard breached the contract with respect to both provisions. We are not persuaded. The jury's award consisted only of back pay and front pay. The jury did not award any punitive damages. Thus, the jury award was based on the amount of money Professor Roberts–Williams lost as a result of being denied tenure. The jury found, according to the special verdict sheet, that *each* breach of contract was a substantial factor in the denial of Professor Roberts–Williams' application for tenure. Thus, as the trial court determined in its cogent post-trial memorandum, Professor Roberts–Williams' damages remain the same regardless of whether Howard breached one or two provisions of the handbook.

### Professor Roberts–Williams' Cross–Appeal

Because we do not disturb the jury's damages award, we need not reach the merits of Professor Roberts–Williams' cross-appeal.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

11. Professor Roberts–Williams presented testimonial and documentary evidence concerning the award of tenure to Mark Jolin, another professor in the Department of Theatre Arts. Through this evidence, Professor Roberts–Williams sought to demonstrate that she had more qualitative and quantitative publications than Professor Jolin, and hence, that when compared to him, she should have received tenure.