Otis JACKSON, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–1216.

District of Columbia Court of Appeals.

Argued May 1, 2012.
Decided Sept. 26, 2013.

Deborah Persico, for appellant.

Stratton C. Strand, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed,

and Denise M. Clark, Assistant United States Attorney, were on the brief, for appellee.

Before GLICKMAN and BECKWITH, Associate Judges, and FERREN, Senior Judge.

BECKWITH, Associate Judge:

A jury found appellant Otis Jackson Jr. guilty of murdering his brother, threatening their father, and setting fire to their house. Then, in the second part of a two-phase trial, the same jury rejected Mr. Jackson's claim that he was not responsible for the crimes by reason of insanity. Mr. Jackson now challenges various decisions the judge made in conducting his bifurcated trial, and he argues that some of his convictions on related weapons offenses ought to be reversed on Second Amendment grounds. While we remand for further proceedings on Mr. Jackson's convictions for carrying a pistol without a license and possession of an unregistered handgun, we affirm all of his other convictions.

## I. Facts and Procedural History

Mr. Jackson's family members and others who visited the Jackson home throughout 2003 noticed that he and his brother Carlton were not getting along. The two men argued and fought over various things, including the care of their elderly father, Otis Jackson Sr., with whom they lived in a two-story row house in northeast Washington, D.C. Police were called to the house numerous times in 2003. That fall, after the fights had turned physical and after family members had heard Mr. Jackson make threats to kill Carlton, Mr. Jackson and his brother filed for protective orders against one another.

On November 20, 2003, the day before a court hearing on one of the protective orders, Mr. Jackson killed his brother in their home, hitting him with a hammer and shooting him thirteen times with a shotgun and pistol. Otis Jackson Sr. testified that during the fight, Carlton called downstairs to his father, who came upstairs but left the house for a neighbor's after Mr. Jackson pointed a gun at him and told him to leave or get shot. Evidence from the crime scene suggested that Mr. Jackson gathered the hammer, guns, and empty shotgun shells, placed them in his room, and then locked the door before spreading gasoline in various parts of the house and setting fire to it.

Mr. Jackson's trial took place in two phases, one to decide his factual guilt (the merits phase) and the other to decide whether he was not guilty by reason of insanity (the criminal responsibility phase). In the first phase, Mr. Jackson took the stand to claim that he killed his brother because of his belief that his brother was possessed by a demon trying to kill him.[1] He began by saying that from an early age he had believed in supernatural entities and performed rituals invoking their help to succeed in life. It was through one of these rituals in 2002 that Mr. Jackson accidentally summoned a demon that immediately possessed his brother, he said.

The demon's influence, according to Mr. Jackson, caused his brother to become increasingly antagonistic to him over the next year, during which the two men fought over control of their father's care

---

1. Although Mr. Jackson's defense theory was primarily one of "imperfect self-defense," *Swann v. United States*, 648 A.2d 928, 930–32 (D.C.1994), he also argued full self-defense. In addition to instructing jurors on circumstances mitigating murder to manslaughter, the judge instructed them that the defense theory was that Mr. Jackson used full self-defense, "acting reasonably in response to Carlton Jackson threatening to end his life, confronting him with a firearm and trying over and over to shoot him."

and finances. This tense situation reached a breaking point on the morning of November 20, 2003, Mr. Jackson said, when his brother confronted him, demanded that he call off the court hearing for the following day, and then attacked him with a shotgun. In his testimony, Mr. Jackson described a protracted struggle to survive his demon-possessed brother's assault, including a firefight in his brother's bedroom that resulted in Mr. Jackson shooting his brother repeatedly because his brother "kept coming and coming and coming."

Mr. Jackson attempted to explain away much of the testimony and physical evidence against him. He denied threatening his father and said it was he who called downstairs for help, not his brother. He also claimed the demon forced his brother to call 911 that morning and lie to the operator by saying Mr. Jackson was in the middle of attacking him. Mr. Jackson said he did not set fire to the house or spread gasoline anywhere, and while he knew nothing about the fire, he said his brother smelled like gasoline after going downstairs during a break in the fight. Mr. Jackson denied ever threatening his brother's life. He insisted that his brother had threatened *his* life because of the demon possession, adding: "I knew I was acting in self-defense. All of what my brother had told me had finally come to pass that day: He was trying to kill me."

The jury found Mr. Jackson guilty of all the charges against him, and the trial proceeded before the same jury to the criminal responsibility phase. Mr. Jackson testified again, expanding on his beliefs in demons and "fallen angels." The government confronted him with the fact that he had been interviewed multiple times by two different psychiatric examiners before he said anything about his beliefs or his brother's demon possession. Mr. Jackson presented a psychiatrist, Dr. Wayne Blackmon, who testified that Mr. Jackson's behavior when he killed his brother was affected by schizotypal personality disorder and an "underlying diffuse brain disorder," constructional apraxia, the latter of which caused him to be inconsistent when explaining the event. Based on Dr. Blackmon's testimony that people with schizotypal personality disorder may suffer psychoses when under extreme stress, Mr. Jackson argued that he had a break with reality on November 20, 2003, due to stress in his personal life and the attack from his brother. Counsel argued that Mr. Jackson, who had no criminal history, "believed he was taking his brother's life so that he could live ... [He] did not appreciate the wrongfulness of his conduct."

The government called three experts in the trial's second phase: two experts from St. Elizabeths Hospital who examined Mr. Jackson during two stays there while in pretrial custody, and a hired forensic psychiatrist, Dr. Raymond Patterson. These experts agreed that Mr. Jackson had a personality disorder—Dr. Patterson distinguished personality disorders from full mental illness—but that the disorder had no effect on his behavior when he killed his brother. Two of them also agreed that Dr. Blackmon's methods in diagnosing diffuse brain disorder in Mr. Jackson were inadequate, and they instead believed the inconsistencies between his story and the other evidence in the case showed that Mr. Jackson was "malingering," or faking his symptoms of mental illness. During closing argument in the merits phase, the government had argued that the physical evidence and his family's testimony significantly impeached Mr. Jackson's version of events, and prosecutors continued this line of argument in the next phase. In opening and closing statements, prosecutors argued that the evidence from the merits phase showed that Mr. Jackson was able to control his behavior and comply with

the law on the day he killed his brother, and in combination with the expert testimony the evidence showed Mr. Jackson was not legally insane at the time of the crime. At the end of the criminal responsibility phase, the jury again found Mr. Jackson guilty on all of the charges against him.

## II. Discussion

Mr. Jackson raises several claims on appeal. He challenges: (1) the denial of his motion to have the trial bifurcated in front of two separate juries and other procedures used during the trial, which he says prejudiced both defenses, (2) the denial of his request to present expert testimony during the merits phase on the issue of his mental state, (3) the court's handling of expert testimony, during the trial's second phase, on the ultimate issue of criminal responsibility, (4) the denial of his request to put on expert rebuttal testimony in the criminal responsibility phase, and (5) his convictions on weapons charges, in light of recent United States Supreme Court rulings interpreting the Second Amendment.

### A. Bifurcated Trial Procedures

Mr. Jackson first argues that the trial court abused its discretion by denying his request for each of the trial's two phases to be presented to a different jury. He claims prejudice in several respects. We conclude that the trial court did not abuse its discretion in denying a bifurcated trial before separate juries fundamentally because his merits and insanity defenses were not inconsistent.

#### 1. Background

Before trial, Mr. Jackson gave notice of his intent to claim that he was not guilty

by reason of insanity because at the time he killed his brother he believed his brother was possessed by a demon trying to kill him. Mr. Jackson asked the court to split the proceedings into two phases, arguing that he "would be the essential witness" on each issue because he was putting forth a self-defense claim and an insanity claim, and thus it would be unfairly prejudicial to have a single trial in which a jury was asked to decide both things simultaneously. He asked for a different jury to decide the issues in each phase.

■ As the lineup of experts involved in the case changed in the months leading up to his trial, Mr. Jackson's defense theories and plan for trial evolved, as did the trial judge's thinking on his motions. The first expert hired by the defense to examine Mr. Jackson concluded that while he experienced delusions, they did not cause him to kill his brother. The trial court denied his motion for a bifurcated trial because neither his proffered self-defense claim nor his proffered insanity defense was "substantial" enough to make a unitary trial prejudicial.[2] The following month, however, Mr. Jackson argued that his defense on the merits was essentially one of imperfect self-defense—that because of his delusion, he unreasonably believed his brother was trying to kill him. Due to this shift, the judge indicated he might reconsider his ruling on bifurcation, while the government argued that the two defenses were now "essentially the same."

Later, however, a second defense expert (Dr. Blackmon), authorized by the trial court just weeks before the trial date, disagreed with the first expert and found Mr. Jackson not criminally responsible because of personality and brain disorders. In light of this change, the defense moved for

2. To demonstrate the need for a bifurcated trial, the defendant must make "a substantial proffer both on the merits and the issue of responsibility." *Lucas v. United States,* 497 A.2d 1070, 1073 (D.C.1985) (internal quotation marks omitted).

reconsideration of the bifurcation issue and argued that a jury in a single trial would not be able to consider each of the issues fairly in isolation. In other words, if Mr. Jackson's testimony about his state of mind—an issue crucial to the imperfect self-defense claim—were followed by a government witness on the insanity issue claiming Mr. Jackson was faking his mental difficulties, the jury would not be able to fairly consider whether Mr. Jackson's testimony on the merits was credible. The government, meanwhile, argued that a bifurcated trial was not warranted because the defenses were not inconsistent and, if each phase had its own jury, they would be forced to present all over again the same evidence contradicting Mr. Jackson's version of events. The judge, noting that he was attempting to craft a procedure to address each side's argument for prejudice, ruled that the trial would be bifurcated but conducted in front of a single jury. The judge did not change his mind that bifurcation was unwarranted because the two defenses were not inconsistent, but rather ruled based on the defense's "very legitimate concern that at a unitary trial, the jury might very well consider the government's psychiatric experts ... essentially as expert witnesses testifying about the defendant's credibility."

As to the need for two juries, the judge made his thinking clear in discussions before his ruling on bifurcation. It would be difficult, he said, for a single jury, even in

a bifurcated trial, to sort out an insanity claim—involving the defendant admitting guilt but claiming he acted irrationally— after hearing from the defendant during the merits phase either that he did not commit the crime at all or that the killing was justified because he rationally believed that it was necessary to avoid his own death. But in Mr. Jackson's case, "where the defense essentially is [that] because of the defendant's mental condition ... he didn't have the specific intent to kill ... [and] didn't act with malice ... [and] didn't premeditate and deliberate ... that to me does not seem inconsistent with what would then be the second part."[3] While months earlier, at the time of her original bifurcation motion, counsel maintained that there would have to be separate juries for bifurcation to make sense, she did not renew, at the time of the judge's final ruling, any objection to having a single jury preside over a bifurcated trial and did not articulate any additional prejudice that would result from conducting the trial that way.

### 2. Analysis

 This jurisdiction long ago settled that bifurcation may be necessary in some, but not all, insanity cases to avoid the "substantial prejudice [that] may result from the simultaneous trial on the pleas of insanity and 'not guilty.'" *Holmes v. United States,* 363 F.2d 281, 282 (D.C.Cir.1966)

**3.** Unlike his position on appeal, Mr. Jackson's argument about prejudice in the trial court appeared to be focused solely on damage to his credibility if he testified in his own defense in the merits phase while the government experts told the jury he was malingering. The judge, too, was mainly focused on this aspect of prejudice, though he did mention a hypothetical situation where "for fear of ... appearing like a liar ... to the jury" a defendant presenting a full defense on the merits would oppose a bifurcated trial in front of a single jury because "at the second

trial all of a sudden they say well, you know, never mind what we said about being not guilty. What we really mean to tell you is not guilty by reason of insanity." The judge later noted, however, that "I think the result" of bifurcation in front of a single jury in Mr. Jackson's case "is unlike in some other circumstances" because "I don't think there'd be a problem with the defendant losing credibility in front of the jury at the second phase ... by taking a position that was at odds with ... the first phase of the trial."

(citations omitted); *see also Lucas v. United States,* 497 A.2d 1070, 1073 (D.C.1985) ("The presence of a substantial insanity defense does not, of itself, require bifurcation.").[4] The trial judge here was careful to assess Mr. Jackson's proffers on both his merits and insanity defenses, and to weigh potential prejudice in both stages of the trial.

■■■■ This court has explained that "[t]he aim of a bifurcated trial is to mitigate the possibility of such prejudice by separating as much as possible the issue of mental responsibility from the factual elements of the accused's conduct." *Jackson v. United States,* 404 A.2d 911, 925 (D.C. 1979) (citing *United States v. Taylor,* 510 F.2d 1283 (D.C.Cir.1975)). As substantial as the potential prejudice in a unitary trial may be, the decision whether to bifurcate "rests within the sole discretion of the trial judge, and no abuse of discretion will be found in denying the bifurcation, unless the defendant proffers a 'substantial claim' for the necessity thereof." *Id.* (citation omitted). The defendant bears the burden of demonstrating the need for a bifurcated trial "by making a 'substantial proffer both on the merits and the issue of responsibility,'" *Lucas,* 497 A.2d at 1073 (quoting *Kleinbart v. United States,* 426 A.2d 343, 354 (D.C.1981)), and by showing that these two defenses are incompatible. *See United States v. Duran,* 96 F.3d 1495, 1499 (D.C.Cir.1996) (citing *Holmes, supra* ).

■■■■ The judge's discretion extends further: it also encompasses prescribing a procedure for the bifurcated trial, "even the impaneling of a second jury to hear the second stage if this appears necessary to eliminate prejudice." *Holmes,* 363 F.2d at 283. A defendant is not, however, "entitled to two juries as a matter of right." *Harris v. United States,* 377 A.2d 34, 39 (D.C.1977) (citing *Parman v. United States,* 399 F.2d 559, 562 (D.C.Cir.1968)). Instead, as in demonstrating the need for bifurcation in the first place, the defendant "must proffer a substantial claim to justify a second jury," and the court maintains broad discretion in considering whether this procedure is necessary. *Id.* (citations and internal quotation marks omitted). In any case, "[t]he procedure adopted ... must effectuate the purpose of bifurcation by guarding against two types of prejudice inherent in a unitary trial involving insanity: (1) prejudice to a defendant's insanity defense arising from the evidence on the merits, and (2) prejudice to a defendant's defense on the merits arising from the insanity evidence." *Jackson,* 404 A.2d at 925.

Mr. Jackson's claim involves decisions the judge made after the initial one bifurcating the proceedings—decisions that necessarily set the course for the trial and had some effect on the way the case was presented to jurors. Our analysis thus is primarily concerned with those decisions. We are, however, mindful of the circumstances surrounding the trial judge's decision whether to bifurcate in the first place, which he reached despite finding that Mr. Jackson had not made the requisite "substantial proffer both on the merits and the

---

4. *Holmes* characterized the potential prejudice this way:

"[An insanity plea] requires testimony that the crime charged was the product of the accused's mental illness. Ordinarily, this testimony will tend to make the jury believe that he did the act. Also, evidence of past anti-social behavior and present anti-social propensities, which tend to support a de-

fense of insanity, is highly prejudicial with respect to other defenses. Moreover, evidence that the defendant has a dangerous mental illness invites the jury to resolve doubts concerning commission of the act by finding him not guilty by reason of insanity, instead of acquitting him, so as to assure his confinement in a mental hospital." 363 F.2d at 282.

issue of responsibility." *Lucas*, 497 A.2d at 1073 (internal quotation marks omitted). This fact is relevant to analyzing whether the trial court abused its discretion in prescribing the bifurcated trial's procedure, but it is not dispositive. We do not agree with the government's contention that because "[h]ere, the trial court would not have abused its discretion in denying bifurcation altogether[,] necessarily . . . it cannot have abused its discretion in granting bifurcation before a single jury." Our cases and others demonstrate that many of the decisions concerning bifurcation proceedings are fraught with potential prejudice. *See, e.g., Jackson*, 404 A.2d at 925–26 (concluding judge abused discretion in refusing to conduct separate voir dire for responsibility phase and in questioning jurors about insanity defense before merits phase); *Taylor*, 510 F.2d at 1289 (concluding judge abused discretion in refusing to empanel separate juries for each phase where defendant claimed full self-defense on the merits and insanity). It follows that a judge who grants bifurcation, even when it would not be an abuse of discretion to deny it, might through subsequent decisions not only fail to "effectuate the purpose of bifurcation," *Jackson*, 404 A.2d at 925, but increase prejudice to the defendant beyond what would have existed in a unitary trial.

The trial judge did not abuse his discretion, however, in deciding here that a bifurcated trial in front of a single jury was adequate to eliminate the particular prejudice at issue. By his own admission, the judge was not worried that bifurcation, even with two juries, would waste time or be inefficient. His thorough analysis of the issues here—considered and reconsidered in months of pretrial proceedings—showed significant concern for the defendant's ability to present a strong defense. In the end he found that unfair prejudice lurked in a unitary trial not because he was wary of inconsistent defenses; he instead ruled for bifurcation because he agreed with defense counsel's only argument on the issue of prejudice, that there was a "very legitimate concern that at a unitary trial, the jury might very well consider the government's psychiatric experts . . . essentially as expert witnesses testifying about the defendant's credibility." This argument concerned prejudice to the defendant's testimony on the merits, in reference to his claim of imperfect self-defense, see *supra* note 3, and the procedure the judge prescribed thus addressed that particular prejudice.

Any remedy to this potential prejudice needed only to avoid juxtaposing testimony from experts calling Mr. Jackson a malingerer with testimony from Mr. Jackson on issues, such as his merits defense, for which their opinions would be irrelevant. The judge's ruling accomplished this. It is true, as Mr. Jackson argues, that in a case where a defendant raises a legitimate self-defense claim, one that would result in acquittal if found by the jury, empaneling a new jury for the responsibility phase likely would be necessary to avoid putting defense counsel "in the position of arguing before the same set of jurors that [the defendant] acted reasonably in . . . protect[ing] himself, and . . . later arguing to them that he was irrational." *Taylor*, 510 F.2d at 1288–89. But that is not this case. Mr. Jackson did not make a "substantial claim" for two juries, and we cannot say the judge abused his discretion in holding the trial with only one. *See Shanahan v. United States*, 354 A.2d 524, 527–28 (D.C. 1976) (noting that "appellant must have proffered a substantial claim [for two juries] in the trial court before we can find an abuse of discretion" (internal quotation marks omitted)).

■ On appeal Mr. Jackson also argues that the proceedings as they occurred show that he needed two juries and that

the judge should have conducted the trial differently. Citing *Jackson*, he specifically claims that the judge should not have informed jurors at voir dire before the merits phase that the trial would proceed to a second phase on the issue of insanity if they found that he committed criminal acts. And he claims, citing *Taylor*, that the prosecutor should not have been allowed to argue that Mr. Jackson's cooperation with police upon being arrested, just minutes after killing his brother, demonstrated that he was not insane because he could conform his conduct to the requirements of the law.[5] *See Taylor*, 510 F.2d at 1290. Mr. Jackson also argues that he was prejudiced during the criminal responsibility phase in two other ways: first, because jurors could not impartially listen to his testimony on mental illness, having already determined from the first phase that he was not credible; and second, through the admission in the second phase of all the evidence from the merits phase, which he claims defeated the purpose of bifurcation.

While it is true that impaneling two juries likely would have avoided all of these issues, we cannot say as a matter of hindsight that the judge abused his discretion in failing to assume they would become problems and order two juries to forestall them. It is relevant that the judge already had found that Mr. Jackson failed to make a "substantial claim" for that procedure. It also appears Mr. Jackson's trial lawyer did not object with re-

spect to any of these issues during trial,[6] so it is difficult to conclude that the judge abused his discretion through any of the specific decisions that gave rise to these issues. *Cf. Duran*, 96 F.3d at 1507 ("Because the defendant failed to object to these [issues] at trial, we determine whether they created unfair prejudice in their own right under the 'plain error' standard" of *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).).

Prior cases such as *Jackson* and *Taylor* have, however, directly addressed the prejudicial nature of the specific procedural decisions Mr. Jackson challenges. It is thus necessary to look more closely at whether any actual prejudice resulted here, but we ultimately conclude that there was no prejudice to Mr. Jackson, primarily because his merits and insanity defenses were not inconsistent. Unlike in *Jackson*, where the defendant's merits defense was that he was not the person who committed the crime, telling Otis Jackson's jurors before the merits phase that the trial potentially would have a second phase on insanity was not prejudicial. *See* 404 A.2d at 925. Here, Mr. Jackson's merits defense—even from his opening statement—not only admitted that he killed his brother but also claimed he was losing control and acting irrationally when he did it. There was no Catch-22 here because Mr. Jackson's case from the beginning was predicated on evidence that he killed his brother due to his abnormal beliefs, and so

---

5. The standard for legal insanity in this jurisdiction states that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of a mental disease or defect he lacked substantial capacity either to recognize the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Bethea v. United States*, 365 A.2d 64, 79 (D.C.1976).

6. The parties disagree about whether the defense objected to alerting the jury to the tri-

al's bifurcation before the first phase even started. The record shows that defense counsel made no specific objection when the trial court proposed informing jurors early to avoid having to conduct a second voir dire later. Counsel argued, however, that the court should avoid "[g]iving the jury specifics about the possibility of two phases" because "I think the possibilities of the mental aspects may be addressed by way of voir dire questions." Because Mr. Jackson was not prejudiced we need not resolve this issue.

there was little danger the jury already would believe as he began his merits defense that he was lying about his actions that day.

For this reason it also was not prejudicial that Mr. Jackson testified again during the responsibility phase, after the jury already had implicitly found, through its guilty verdict, that his merits testimony was not credible. His testimony in both phases was essentially the same. Jurors' determination of his legal sanity, however, was not dictated by a rejection of his merits defense claim; jurors could have found that his inconsistency in telling the story of his brother's demon possession was further evidence of mental illness. Indeed Mr. Jackson argued as much, supported by Dr. Blackmon's testimony regarding his diffuse brain disorder.

Neither was there prejudice in the admission of merits phase evidence in the trial's second phase. Mr. Jackson's particular claim of insanity was so connected with the facts of the crime that it would be difficult to conceive of evidence from the first phase that would be irrelevant or unfairly prejudicial to his insanity claim. Mr. Jackson's own testimony was crucial to his insanity plea because it set out his intensifying delusions in the year before the killing, the specific progression of his delusional reaction to provocation by his brother on the day of the killing, and his attempt to explain that he did not at first tell psychologists about his delusions because his beliefs dictated that he keep them a secret.

█ On the other hand, the government's evidence during the merits phase was relevant to the second, responsibility phase. It included testimony from Mr. Jackson's family, friends, and acquain-

tances that he did not act abnormally or out of touch with reality. It included physical evidence that contradicted observations Mr. Jackson said he had that day[7] as well as his testimony that his brother was the aggressor. Even disturbing evidence such as Carlton's scream-filled 911 call was relevant and not unfairly prejudicial because it rebutted Mr. Jackson's contention that his brother provoked a confrontation triggering his delusion. While the purpose of bifurcation is to "separate[e] as much as possible" the facts of the crime from testimony on insanity, *Jackson*, 404 A.2d at 925, this purpose falls away when evidence of the crime is relevant to impeach insanity testimony or rebut evidence that at the time of the crime the defendant could not control his actions or appreciate their wrongfulness.

█ Finally, as for the prosecutor's argument that Mr. Jackson's cooperation with police after the murder was evidence that he could conform his behavior to the requirements of the law, the principle drawn from *Taylor* is clear enough: such an argument does not belong in an insanity trial, where the defendant's submission to a show of authority from the police is not very relevant to whether he could control his behavior in a normal setting. *See Taylor*, 510 F.2d at 1290 (holding prosecutor's similar comments were improper because "[t]he question is not properly put in terms of whether he would have capacity to conform in some untypical restraining situation—as with an attendant or policeman at his elbow" (quoting *United States v. Brawner*, 471 F.2d 969, 991 (D.C.Cir. 1972))). Yet the D.C. Circuit in *Taylor* did not reverse because of its concerns over the prosecutor's argument alone; the court

---

7. This evidence included, for example, the fact that the shotgun casings were not found in Carlton's bedroom, where Mr. Jackson said the shooting happened, and the autopsy evidence that Carlton had gunshot wounds on the back of his leg, when Mr. Jackson denied that he shot Carlton with the pistol in the leg.

"considered together ... several difficulties ... affecting the second phase of the trial" in deciding to reverse, including the judge's decision not to impanel a separate jury for the responsibility phase. *Id.* at 1288–92. Rather than concluding the prosecutor's argument caused actual prejudice, the court noted that "especially since this case was apparently a close one for members of the jury [who deliberated on the insanity issue for eight hours and were deadlocked for a time] ... they could well have been prejudicially misled by the prosecutor's statement." *Id.* at 1290.

Mr. Jackson's insanity case was not so hard for jurors by that measure—they deliberated for less than four hours and did not send any notes. And although the prosecutor made a lengthy commentary on how Mr. Jackson's cooperation with police showed that he could "follow the law," this was one example of many given to show that Mr. Jackson was able to control his behavior that day, including the testimony of his family that he was not out of touch with reality and the opinions of three doctors that his behavior was unaffected by his personality disorder. We cannot conclude that whatever prejudice resulted from these comments was enough to require reversal given that Mr. Jackson did not object to them at trial.

## B. Expert Testimony on *Mens Rea*

Mr. Jackson next claims that the trial court "erroneously interpreted" this court's decision in *Bethea v. United States,* 365 A.2d 64 (D.C.1975), and wrongly kept him from putting on during the merits phase expert testimony consisting of "observation evidence" of Mr. Jackson's "tendency to think in a certain way and his behavioral characteristics." This error, he says, "implicate[d] constitutional rights to due process and a fair trial." Although *Bethea* does not necessarily bar all expert testimony on this issue of *mens rea,* we conclude on the facts here that the expert testimony Mr. Jackson proffered is tantamount to evidence of diminished capacity, which *Bethea* precludes, and that the Supreme Court's recognition of "observation evidence" in *Clark v. Arizona,* 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006), does not compel admission of the expert observation evidence that Mr. Jackson asked to have admitted.

### 1. Background

Before securing the help of Dr. Blackmon, Mr. Jackson's counsel had sought to have the defense's previous mental health expert testify in support of Mr. Jackson's imperfect self-defense claim. Counsel proposed at that time testimony "not regarding a formal mental illness, but testimony regarding provocation," relating to "the pattern of provoking instances" in the weeks leading up to Carlton's death. Although the expert would not say that Mr. Jackson's mental defect caused him to kill his brother, counsel hoped the expert would testify that because of his mental abnormalities, "[when] Mr. Jackson is provoked to rage over something he holds dear[,] and that's the care of his father[,] [t]he rage does not have an opportunity to abate." Counsel added that this testimony also would cover Mr. Jackson's "angel worship [and] belief in demons" because the expert had formed her opinion of Mr. Jackson's mental conditions based on what he told her concerning his abnormal beliefs, including that his brother was possessed. The expert, counsel suggested, "could talk about how my client would react, but she couldn't say that my client would react this way because he's psychotic, for example."

The trial court framed the proffer this way, and counsel agreed: "The issue is whether [the expert] can ... present expert psychiatric testimony ... essentially to bolster [Mr. Jackson's] testimony ... in

opposition to the government's proof of *mens rea.*" Having already denied a defense motion to "allow expert testimony negating premeditation, deliberation, and specific intent to kill" because it conflicted with *Bethea,* the judge upheld his ruling and noted that "at its core" the proffered expert testimony "is that because of the defendant's mental condition, he believed what he believed and therefore reacted as he reacted."

By the eve of trial, defense counsel had filed a renewed motion to allow expert testimony during the merits phase, this time citing the Supreme Court's explanation, in *Clark v. Arizona,* 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006), of what it called "observation evidence" on the issue of *mens rea. Id.* at 758, 126 S.Ct. 2709. In her motion, counsel described Mr. Jackson's imperfect self-defense theory:

> [T]he defendant is expected to testify that he acted in self-defense believing his brother was going to kill him. He had this belief because he knew from his long history of practicing fallen-angel-worship that he had allowed a demon to possess his brother. . . . On the date of the homicide, Mr. Jackson knew that his brother . . . was possessed . . . and that the demon intended to destroy him. When his brother, the decedent, confronted him belligerently while holding a weapon, Mr. Jackson responded by grabbing for the weapon. As he did so, he saw the demon rise up from his brother's body and envelope [sic] him. Mr. Jackson knew that it was a fight for his life. He responded accordingly.

Dr. Blackmon, newly hired by the defense, would testify about Mr. Jackson's "tendency to think in a certain way and his behavioral characteristics," counsel wrote, quoting directly from *Clark,* 548 U.S. at 757, 126 S.Ct. 2709. Specifically, the expert would testify about "Mr. Jackson's

tendency to believe in fallen-angel-worship and how those tendencies affected his thinking on November 20, 2003, at the time of the homicide; that Mr. Jackson's thinking was influenced by his beliefs in fallen angels or their demons and their abilities to possess and control others." At a final hearing on the matter, counsel argued that "the expert can testify as to . . . the defendant's ability or inability to maintain cogent thought[,] . . . [t]he defendant's belief in, I won't call it delusion, but in something everyone else would say that can't be true[,] . . . [a]nd that will go to the specific intent aspect." She added that she thought the expert could "describe for the jury my client's beliefs, how they affect him, his reactions when challenged[,] [and] . . . how my client reacted when he was with [the expert]. . . ."

The trial judge again upheld his ruling to exclude the defense's expert on mental illness from testifying in the merits phase. He concluded that *Bethea* controlled his decision and that "*Clark* really . . . doesn't do anything to the *Bethea* rule." Mr. Jackson would still be able to present his own testimony on imperfect self-defense, the judge said, along with any lay testimony that corroborated his account of what was going on in his mind.

### 2. Analysis

■ In its 1975 *Bethea* ruling, this court rejected the "diminished capacity" defense. The court differentiated diminished capacity from insanity and defined the former—at least at one point in the opinion-as "expert evidence of the accused's mental abnormalities for the specific purpose of negativing the required *mens rea.*" 365 A.2d at 83 n. 41. The court has since upheld the *Bethea* rule and described it as a "general rule . . . prohibiting differentiation of a defendant's intellectual abilities outside the context of the

insanity defense...." *O'Brien v. United States,* 962 A.2d 282, 301 (D.C.2008); *see also Smith v. United States,* 686 A.2d 537, 548–49 (D.C.1996); *Doepel v. United States,* 434 A.2d 449, 455 (D.C.1981); *Jones v. United States,* 386 A.2d 308, 312 (D.C.1978).

Mr. Jackson claims that the trial court should have allowed his expert to testify in support of his merits defense because *Bethea* does not prohibit the testimony the expert would have given. Instead of diminished capacity evidence, Mr. Jackson argues, he wanted to present the kind of "observation evidence" the Supreme Court defined in *Clark.* The government responds that *Bethea* prohibits all "expert medical evidence ... admitted toward negating the mental state requisite for conviction." *Bethea,* 365 A.2d at 84. Because Mr. Jackson "sought to admit expert testimony to negate the *mens rea* required for conviction of first—and second-degree murder ... this testimony fell squarely within *Bethea*'s prohibition," the government argues.

This issue is not as simple as the government makes it. The Supreme Court in *Clark,* a 2006 case, had much to say about the diminished capacity defense and whether the government may limit expert testimony on a defendant's mental state. The *Clark* opinion was divided, however, and its meaning has been the subject of significant scholarly criticism. And it is difficult to discern how that case interacts with the sometimes-sweeping, sometimes-limited language of *Bethea.* Complicating matters even further, Mr. Jackson's defense theory was in part one of imperfect self-defense, which requires us to closely examine whether his proffered expert evidence fell within or without *Bethea*'s prohibition of the diminished capacity defense. To decide whether the judge erroneously interpreted *Bethea,* then, we have to examine what evidence *Bethea* bans, whether

*Clark* disrupts this rule, and finally whether the rule prohibits the specific evidence Mr. Jackson proffered.

It is clear that this court in *Bethea* rejected the diminished capacity doctrine, which the D.C. Circuit recently had approved of in *Brawner,* 471 F.2d at 999. *See Bethea,* 365 A.2d at 83 (discussing *Brawner* at length in section titled "The Rejection of the Doctrine of Diminished Responsibility"). Yet in doing so, rather than describing the defense solely in terms of the argument it involves or the theory of criminal responsibility it represents, the *Bethea* court repeatedly said it was barring specific evidence. This makes sense given that the diminished capacity doctrine has been characterized as "essentially a rule of evidence." 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 9.2 (2d. ed.2003). But the *Bethea* court's definition of the evidence it was rejecting at times was more expansive than other definitions of the doctrine. *See, e.g.,* LAFAVE, *supra* ("Under the [diminished capacity] doctrine ... evidence concerning the defendant's mental condition is admissible on the question of whether the defendant had the mental state which is an element of the offense with which he is charged.").

The court in *Bethea* used various formulations to describe the type, subject, and purpose of the evidence it was prohibiting. In its narrowest characterizations of the rule, the opinion refers to "expert medical testimony concerning a defendant's mental abnormality ... irrespective of a defense of insanity, for purposes of determining the existence for [sic] the *mens rea* required for the charged offense," *Bethea,* 365 A.2d at 83, and similar formulations. *See, e.g., id.* at 83 n. 41 (referring to "expert evidence of the accused's mental abnormalities for the specific purpose of negativing the required mens rea"). Elsewhere, however, the court broadly referred to all "expert testi-

mony on the issue of *mens rea* (other than through the separate defense of insanity)." *Id.*

The *Bethea* court also discussed at length the specific mental states a diminished capacity defense would work to negate. The appellant in *Bethea*, charged with murder, had sought an instruction that his evidence of insanity—presented during a unitary trial along with his merits defense—could also be considered "on the issues of premeditation, deliberation, and malice." *Id.* at 83. As a justification for its decision rejecting this instruction, the court noted that while *Brawner 's* explanation of the diminished capacity defense seemed to limit its use to negating *mens rea* in specific-intent crimes like murder, this limitation was untenable. *Id.* at 90. "Assuming the competency of experts to testify as to an accused's capacity for specific intent," the court wrote, "we see no logical bar to their observations as to the possible existence or lack of malice or general intent." *Id.* The court thus said it was guarding against "the unrestrained application of the diminished capacity doctrine." *Id.*

The common thread uniting the various formulations of the rule in *Bethea* was the court's intent to abolish the diminished capacity defense. And the court was clear that it was doing so to avoid "open[ing] the door to variable or sliding scales of criminal responsibility" and to uphold a "basic principle" of criminal law, that "all individuals are presumed to have a similar capacity for *mens rea.*" *Id.* at 88. The fact that a defendant would need an expert to put on a diminished capacity defense also weighed on the court: mental illness—unlike intoxication, infancy, and the few

other common conditions for which the law is willing to depart from the presumption of capacity—is not "susceptible to quantification or objective demonstration, and to lay understanding." *Id.*

 In light of these purposes and the varying formulations of the type of evidence being prohibited, we are left with the impression that *Bethea*'s focus was on barring a defendant from defending himself on the diminished capacity theory—in other words, using expert testimony of a mental abnormality to claim that, because of the mental condition, he lacked capacity to form the required *mens rea.* We think that this court's decisions following *Bethea* were correct to characterize that case as announcing that "there is no defense of diminished capacity in the District of Columbia," *Smith*, 686 A.2d at 549, and as a "general rule ... prohibiting differentiation of a defendant's intellectual *abilities* outside the context of the insanity defense." *O'Brien*, 962 A.2d at 301 (emphasis added). We reject an alternative reading that *Bethea* bars literally all "expert testimony on the issue of *mens rea.*" That reading would seem to have the potential to sweep in testimony supporting defenses that have nothing to do with a claim of diminished capacity. *See, e.g., Ibn–Tamas v. United States*, 407 A.2d 626 (D.C.1979) (allowing in certain circumstances a defense involving battered woman syndrome).

 It is not decisive, then, that Mr. Jackson wanted to use expert testimony to argue that he did not have the required *mens rea.* He did not couch his defense in terms of "diminished capacity" but rather claimed imperfect self-defense, which involves negating the malice [8] required for a

---

**8.** While *Bethea* contemplated that a defendant could argue his mental condition showed he lacked the capacity to form malice, 365 A.2d at 90, it did not discuss how this would work, especially given that "malice" in fact encom-

passes four distinct mental states, including but not limited to specific intent to kill. *See Comber v. United States*, 584 A.2d 26, 38 (D.C. 1990) (en banc) (citation omitted). Thus, voluntary manslaughter is not, precisely, a kill-

murder conviction but does not necessarily involve a defendant's mental capacity. *See Swann v. United States,* 648 A.2d 928, 930–32 (D.C.1994) (recognizing circumstances that negate malice and mitigate murder to manslaughter, including "a defendant's actual belief both in the presence of danger and the need to resort to force, even if one or both beliefs be objectively unreasonable....."). Given that imperfect self-defense and diminished capacity are different defenses,[9] and given *Bethea's* focus on eliminating the diminished capacity defense, the trial court was correct to examine the essence of the proffered expert testimony. It seems clear that the purposes of *Bethea* would bar expert testimony, especially concerning a mental abnormality short of insanity, if the testimony essentially supported a diminished capacity defense. And this overlap, between the theories of imperfect self-defense and diminished capacity, would be especially present where, as here, the defendant's mental abnormality is what he says caused his unreasonable belief that deadly force was necessary to save his life.

Mr. Jackson does not, however, hinge his argument on the nuances of the diminished capacity defense. He puts forth a different but related claim—in effect that the Supreme Court's recent delineation of "observation evidence" as a means of negating *mens rea* requires that Mr. Jackson have been allowed to present such evidence if *Bethea* does not, as he argues, prohibit it. This argument is premised on the idea that the Supreme Court did something of constitutional significance in differentiating among three types of evidence "with a potential bearing on *mens rea.*" *Clark,* 548 U.S. at 757, 126 S.Ct. 2709.

In *Clark,* the majority defined two types of expert opinion evidence used to challenge *mens rea,* which it called "mental-disease" and "capacity" evidence:

"[M]ental-disease evidence" [is] in the form of opinion testimony that Clark suffered from a mental disease with features described by the witness.... [T]his evidence characteristically but not always comes from professional psychologists or psychiatrists who testify as expert witnesses and base their opinions

---

ing without malice aforethought but rather a killing "with a state of mind which, but for the presence of legally recognized mitigating circumstances, would render the killing murder." *Id.* at 42. It follows that, as with the defense of voluntary intoxication, a defendant would be making an inapposite argument if he claimed his abnormal mental condition meant he "lacked capacity" to form malice. *See Wheeler v. United States,* 832 A.2d 1271, 1275–76 (D.C.2003). Because Mr. Jackson's defense was at bottom one of diminished capacity, we need not generally decide whether a defendant ever could present expert testimony supporting a claim of mitigation—or justification, for that matter, *see Smith,* 686 A.2d at 549 (deciding on other grounds a claim involving a defendant's argument that he should have been able to present an expert "explain[ing] to the jury why his perception of a continuing threat was not unreasonable")—especially on the subjective standard for imperfect self-defense. *See Simmons v. State,*

313 Md. 33, 542 A.2d 1258, 1259 (1988) (holding, in a state without the diminished capacity defense, that it was error for a trial court to exclude as a matter of law expert testimony from a psychiatrist "that her examination of Simmons revealed that he did *in fact* have such a subjective belief"); *but see Bishop v. United States,* 107 F.2d 297, 301–03 (D.C.Cir.1939) (rejecting defendant's argument that intoxication defense could be used to establish the mitigating circumstance of adequate provocation because the "heat of passion" standard assumes an "ordinary man," meaning "a sober man").

9. Imperfect self-defense has nothing inherently to do with a defendant's capacity to form a particular mental state. *See generally Simmons, supra* note 8 (distinguishing between diminished capacity and imperfect self-defense); *In re Christian S.,* 7 Cal.4th 768, 30 Cal.Rptr.2d 33, 872 P.2d 574 (1994) (same).

in part on examination of a defendant, usually conducted after the events in question. The thrust of this evidence was that, based on factual reports, professional observations, and tests, Clark was psychotic at the time in question, with a condition that fell within the category of schizophrenia.... "[C]apacity evidence" [is] about a defendant's capacity for cognition and moral judgment (and ultimately also his capacity to form *mens rea*). This, too, is opinion evidence ... from the same experts and concentrate[s] on those specific details of the mental condition that make the difference between sanity and insanity....

*Id.* at 758, 126 S.Ct. 2709.

The Court also defined a third category, "observation evidence," which does not involve opinion:

"[O]bservation evidence" in the everyday sense [is] testimony from those who observed what Clark did and heard what he said; this category would also include testimony that an expert witness might give about Clark's tendency to think in a certain way and his behavioral characteristics. This evidence may support a professional diagnosis of mental disease and in any event is the kind of evidence that can be relevant to show what in fact was on Clark's mind when he fired the gun.

*Id.* at 757, 126 S.Ct. 2709. The record evidence the Court cited as "observation evidence," *id.*, did not, however, include anything an expert said, so it is unclear what the boundaries of *expert* observation evidence are. *See id.* at 782–83, 126 S.Ct. 2709 (Kennedy, J., dissenting) (describing

how the majority's categories "break down quickly" because expert observation evidence of a defendant's symptoms of mental illness "differs from mental-disease evidence only in forcing the witness to pretend that no one has yet come up with a way to classify the set of symptoms being described").

The majority, joined by Justice Breyer, ultimately held 6–3 that due process allows the prohibition of "mental-disease evidence" and "capacity evidence" when used to challenge the government's proof of *mens rea*. But the defendant in *Clark* did not preserve a challenge to the exclusion of observation evidence, so the Court made no conclusion as to the due process implications of excluding such evidence. *Id.* at 764–65, 126 S.Ct. 2709.

It is significant, of course, that the Supreme Court ruled that the Constitution permitted the exclusion of capacity and mental-disease evidence only after finding that the Arizona courts still allowed observation evidence. *See id.* at 760, 126 S.Ct. 2709. Absent a ruling that due process demands the admission of observation evidence, however, it is not clear that *Clark* has any ramifications for our holding in *Bethea*—except to the extent that its recognition of observation evidence either gives us pause in sweepingly applying *Bethea* as an outright ban on all expert testimony bearing on any aspect of a defendant's mental state, or predicts a future due process holding by the Supreme Court and thus gives us reason to revisit *Bethea*.[10] Even so, these considerations would become important only if it were clear that the expert testimony Mr. Jack-

10. Critics of disallowing diminished capacity evidence cite the "mistaken assumption that the doctrine does not involve considerations separate and distinct from established law concerning the defense of insanity." 2 LaFave, Substantive Criminal Law § 9.2(a). *Bethea* itself has been cited for failing to recognize the "clear distinction"

between "diminished capacity" and "a straightforward denial of a requisite element, akin to a denial that one acted or to a mistake of fact." Stephen J. Morse & Morris B. Hoffman, *The Uneasy Entente Between Legal Insanity and Mens Rea: Beyond Clark v. Arizona*, 97 J.Crim. L. & Criminology 1071, 1087 & n. 72 (2007).

son proffered would in fact be considered observation evidence as *Clark* envisions it. But after *Clark,* we do not know enough about what observation evidence is—especially the expert kind—to say that Mr. Jackson's proffered expert testimony was it. *See id.* at 782, 126 S.Ct. 2709 (Kennedy, J., dissenting) ("[The Court] adopts an evidentiary framework that, in my view, will be unworkable in many cases.").

Mr. Jackson ultimately mischaracterizes the trial court's ruling. He claims the judge "interpreted *Bethea* as preventing appellant from introducing in the merits phase expert testimony to provide 'observation evidence.'" In fact, though, the trial court ruled that the specific evidence Mr. Jackson sought to introduce was barred by *Bethea* and that *Clark* had no effect on *Bethea.* The judge did not express an opinion on whether Mr. Jackson's proposed evidence was observation evidence under *Clark.*

We likewise are bound to apply *Bethea* to the facts of Mr. Jackson's case. In doing so, we conclude that the evidence he proffered to the court was of a kind *Bethea* prohibits. Though framed as describing "observation evidence," Mr. Jackson's proffer to the trial court does not give us confidence—especially considering *Clark*'s elusive definition of expert observation evidence—that what he wanted to present through his expert was the kind of evidence *Clark* was referring to. Nor did Mr. Jackson argue for a use of this evidence that would have been exclusive to his imperfect self-defense theory—or any other defense than diminished capacity—and thus potentially outside the scope of *Bethea.*

Coming from a psychiatric expert, testimony about Mr. Jackson's unusual beliefs, about his "ability or inability to maintain cogent thought," and about his "reactions when challenged," would have represented the kind of capacity evidence at the core of the *Bethea* rule. Although the psychiatrist would not have diagnosed Mr. Jackson's disorder during the merits phase, he would have testified that Mr. Jackson's unusual mental condition—as manifested by, in counsel's words, his "belief in, I won't call it delusion, but in something everyone else would say that can't be true"—made him unable to realize that his brother was not trying to kill him. He in effect wanted an expert to differentiate between his mental capacity and that of a normal person "outside the context of the insanity defense." *O'Brien,* 962 A.2d at 301. Because the proposed expert testimony would have been relevant for no other purpose than to point jurors to Mr. Jackson's mental abnormalities, the trial court was left, as we are now, with no other conclusion than that Mr. Jackson essentially sought to present a diminished capacity defense. The trial court thus followed *Bethea*'s core holding and did not commit error in precluding this testimony.

## C. Denial of Ultimate Issue Testimony

Mr. Jackson's third claim is that the trial court erred in keeping him from presenting expert testimony on "the ultimate issue" of criminal responsibility. He concedes that we must review this claim for plain error because trial counsel did not object to the judge's decision, which ruled that as a matter of law the parties would be prohibited from "present[ing] expert testimony that the defendant's conduct [was or] was not causally related to his mental condition."[11] [R.69] Mr. Jackson then must show that: (1) the court committed error, (2) "the error is

---

11. In fact, the judge's order limiting expert testimony in this respect originally was the result of a defense motion that "[r]el[ied] upon local evidence law and Rule 704(b) of the Federal Rules of Evidence." The government agreed not to ask its experts about the ultimate issue, and the judge issued an order limiting expert testimony. Immediately before the criminal responsibility phase, however, after hiring Dr. Blackmon, counsel asked

plain, meaning 'clear' or 'obvious,' " and (3) the error affected Mr. Jackson's substantial rights. *Downing v. United States,* 929 A.2d 848, 858 (D.C.2007). The error also "must 'seriously affect[ ] the fairness, integrity, or public reputation of the judicial proceedings.' " *Id.* (citing *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

 We agree with Mr. Jackson that the court committed error here that is plain. In *Bethea* we held that when experts testify on the issue of insanity "the witnesses should be free to testify directly in an unrestricted manner concerning all relevant matters to which their competence extends, including their conclusions as to the existence of a mental impairment and its relationship to the condemned behavior"—and "thus ... there should be no ban on expressions of causality." 365 A.2d at 82. The government concedes the error but argues that our cases on this issue contain conflicting language and so the error was not "plain." But the language the government cites is not, in our view, truly conflicting. Instead, it remains clear that "[e]xperts are permitted in the District of Columbia to render opinions upon the 'ultimate facts' to be resolved by the jury." *Wilkes v. United States,* 631 A.2d 880, 883 n. 7 (D.C.1993); *see also Lampkins v. United States,* 401 A.2d 966, 970 (D.C.1979) ("In recent years, courts in this jurisdiction have relaxed the ultimate facts rule, holding that an expert may state a conclusion on such facts provided the conclusion is one that laymen could not draw."). As we have said, even in an insanity case, "[t]he real test is not whether the expert opinion testimony would go to the very issue to be decided by the trier of fact, but whether the special knowledge or experience of the expert would aid the

court or jury in determining the questions in issue." *Wilkes,* 631 A.2d at 883 n. 7.

The government contends that this error would not have been clear to the trial judge because elsewhere in *Bethea* the court stated that "[w]hile the witness is competent to express his medical conclusions as to the existence of a cognizable disability and its relationship to the defendant's criminal behavior, the ultimate issue belongs to the trier of fact." 365 A.2d at 81. This section of *Bethea,* however, discusses a point quite different from whether experts should be allowed to testify about causation in insanity cases. It explains the reasons the court, in setting out a new standard for legal insanity in the District, found it necessary to define "mental disease or defect" to exclude "an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *Id.* at 79. If a defendant were allowed to prove his mental disease from the mere fact of criminal behavior, the court reasoned, then an expert could testify that he was "satisfied that an illegal act alone conclusively establishes a mental illness or defect," a determination that, without more, would "come too close to the ultimate question of responsibility." *Id.* at 81. The language cited by the government thus was not a statement specifying the boundaries of expert testimony but one expressing the need for the court's definition of "mental disease or defect" to fit with the idea that it is ultimately jurors, not experts, who decide legal insanity.

Far from equivocating, *Bethea* gave a clear statement that "there should be no ban on expressions of causality." *Id.* at 82; *United States v. Tyler,* 376 A.2d 798, 809 (D.C.1977) (*Bethea* "allows expert witnesses to testify as to causality"). The court had spent pages explaining the "di-

the judge to revisit his ruling. The judge declined but somewhat expanded the scope of

testimony that would be allowed.

lemma of encouraging a maximum of informational input from the expert witnesses while preserving to the jury its role as trier of fact," and citing the semantic restrictions on expert testimony present under previous insanity standards. *See Bethea*, 365 A.2d at 74 n. 22 (quoting case under previous insanity standard which stated that experts "should not speak directly in terms of 'product', or even 'result' or 'cause' " (quoting *Washington v. United States*, 390 F.2d 444, 456 (D.C.Cir.1967))). Yet the court then concluded that the best way to ensure that "the ultimate issue belongs to the trier of fact" was not through "the simple expedient of barring the use of certain words or testimony," but by making sure the testimony would assist the trier of fact, through its limited definition of "mental disease or defect," and by including in the charge to the jury "unambiguous instructions emphasizing that regardless of the nature and extent of the experts' testimony, the issue of exculpation remains at all times a legal and not a medical question." *Id.* at 82–83.[12]

The trial judge did not discuss *Bethea* in his order. It appears that he ruled the way he did at least in part because it was defense counsel who initially sought the limitation and the government agreed to comply with it. But defense counsel's argument, and much of the discussion among the parties and the judge, was based on Rule 704(b) of the Federal Rules of Evidence. The rule's current version states that "[i]n a criminal case, an expert must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," as "[t]hose matters are for the trier of fact alone." Both parties also pointed the judge to a D.C. evidence law treatise that at the time commented that because this court "has not addressed Rule 704(b) nor lately dealt with alleged ultimate issue transgressions in insanity cases[,] . . . it is unclear whether this jurisdiction's general relaxation of the ultimate issue prohibition extends to insanity cases." HON. STEFFAN W. GRAAE & BRIAN T. FITZPATRICK, THE LAW OF EVIDENCE IN THE DISTRICT OF COLUMBIA § 704.01[2] (4th ed.2006).

■■■. Recently, however, this court has noted multiple times that Rule 704(b) did not disrupt our "local law of evidence . . . [which] does not prohibit expert witnesses from stating opinions on ultimate facts or issues to be resolved by the jury." *Blaize v. United States*, 21 A.3d 78, 84 n. 8 (D.C. 2011) (quoting *Gaines v. United States*, 994 A.2d 391, 403 (D.C.2010)); *see also Benn v. United States*, 978 A.2d 1257 (D.C.2009) (reaffirming the allowance of expert testimony on the issue of eyewitness identification in criminal cases, often characterized as an ultimate issue).[13] While historically expert testimony on insanity continued to receive scrutiny even

---

12. The other inconsistent language the government cites comes from *District of Columbia v. Peters*, 527 A.2d 1269 (D.C.1987), but the passage from *Peters* appears to be based on a misreading of *Bethea*. In *Peters*, the court noted that "we have pointed out in a similar context that such testimony [drawing the ultimate conclusion for the jury] is inappropriate." *Id.* at 1277 (citing *Bethea*, 365 A.2d at 75 n. 22). But the *Bethea* court did not in fact make that point, or really any point, in the footnote *Peters* cites—the entire footnote is merely an objective description of a federal case holding under the old insanity standard. *See Bethea*, 365 A.2d at 75 n. 22 (summarizing and quoting at length *Washington*, 390 F.2d at 456). The language in *Bethea* cited in *Peters* thus is meant to represent a view the *Bethea* court in fact parted ways with later in the case.

13. Citing *Gaines* and *Benn*, the latest edition of the D.C. evidence treatise now comes to the conclusion that "contrary to Rule 704(b), the District has sanctioned ultimate issue testimony by experts as to a defendant's 'mental state or condition' in criminal cases." HON. STEFFAN W. GRAAE, BRIAN T. FITZPATRICK, & HON. HENRY F. GREENE, THE LAW OF EVIDENCE IN THE

as expert testimony restrictions were relaxed in other contexts, *Bethea* rode a wave of change in that tradition. *See Bethea*, 365 A.2d at 78–83 & n. 22 (adopting the Model Penal Code definition of insanity and following other courts adopting the definition by establishing that experts now could testify on the issue of causation). And although Rule 704(b) was enacted in 1984, after that change and amid controversy over the insanity defense,[14] our jurisdiction, unlike the federal system, did not take the same opportunity to alter its version of the defense. *See generally* Anne Lawson Braswell, Note, *Resurrection of the Ultimate Issue Rule: Federal Rule of Evidence 704(b) and the Insanity Defense*, 72 Cornell L.Rev. 620, 624 & n. 37 (1987) (summarizing changes brought about in the federal Insanity Defense Reform Act of 1984). We thus see no reason Rule 704(b) should change *Bethea*'s clear holding that an expert is not necessarily

precluded from testifying on an ultimate issue in an insanity case, or carve out an exception for insanity cases from our general opinion that "[i]f expert testimony can assist the jury, it perforce does not usurp the jury's function. Rather, it enhances the jury's ability to perform its role as factfinder." *Benn*, 978 A.2d at 1274.[15]

The conclusion that the judge's ruling was error, and that the error was plain, does not end the matter. This error is nonetheless not reversible because Mr. Jackson cannot show that he was prejudiced or that the integrity of the judicial proceedings would be called into question by the exclusion of the testimony he unsuccessfully sought to elicit from his expert.

To begin with, Mr. Jackson is not correct when he asserts that the government's witnesses were allowed to go further in their testimony than his own witness. It is true that, consistent with the spirit of the judge's ruling,[16] Dr. Mi-

District of Columbia § 704.01[2] (5th ed.2012).

14. Rule 704(b) represented a step back from the federal rules' abolition of the ultimate fact rule in Rule 704(a). Rule 704(b) "was enacted in the wake of the attempted assassination of President Reagan and the murder of John Lennon, and was an attempt to constrain psychiatric testimony on behalf of defendants asserting the insanity defense." *United States v. Gastiaburo*, 16 F.3d 582, 588 (4th Cir. 1994).

15. We note that a recent case contains the following language, which might at first glance appear to approve of a prohibition, as a matter of law, of ultimate issue testimony by an expert: "[N]othing precluded [the expert] from testifying about other matters within her expertise, so long as she did not attempt to offer an opinion about 'the ultimate decision on tenure.'" *Howard Univ. v. Roberts–Williams*, 37 A.3d 896, 910 (D.C.2012); *see also* Graae, Fitzpatrick, & Greene § 704.01[2] (citing *Roberts–Williams* as a case containing conflicting language on this issue). On closer reading, however, it is clear that the internal-

ly quoted phrase about "the ultimate decision" refers to a prior ruling of a trial judge exercising discretion to limit the scope of expert testimony. *Roberts–Williams*, 37 A.3d at 909–10. Putting aside that Rule 704(b) could have no effect on a civil case like *Roberts–Williams*, this limitation is consistent with our statement in *Benn* concerning the trial court's discretion over expert testimony. 978 A.2d at 1262 (noting that a trial judge may "place reasonable limitations" on expert testimony such as prohibiting "the introduction of ultimate conclusions by an expert witness as to the truthfulness of a witness ... and the guilt of the defendant").

16. After defense counsel asked him to reconsider his ruling, the judge said he did not want to restrict Mr. Jackson from presenting his defense. Though he affirmed his ruling, he added: "I have to say my instincts would be to allow the experts on both sides to address [causation] ... [a]s long as their testimony was contained within that category of issues and didn't spill over into saying that because of these effects on the Defendant's thought process or mental state at the time of this incident it's my opinion that he ...

chael Sweda and Dr. Christopher Lange were permitted to testify that they believed Mr. Jackson's mental disorder had no impact on his behavior on November 20, 2003, and that Dr. Patterson was allowed to testify that if Mr. Jackson's disorder affected him at all that day, "it ha[d] to do with the long-standing difficult relationship he and his brother had over several years.... The personality disorder in and of itself is not in any way positive [sic] of the events on that day."

It also is true, however, that the defense expert similarly was allowed to answer the following question from defense counsel: "Dr. Blackmon, can you give us your opinion about the effects of the mental disease and the defect that you've described and the effects they may have had on Mr. Jackson on November 20, 2003?" Dr. Blackmon testified that people with Mr. Jackson's mental conditions are "stably weird" their whole lives, that stress potentially can worsen their condition, and that they are highly likely to misinterpret things around them. They can, he said, have "actual breaks with reality so that it would be totally consistent for such a person to misperceive that an individual is not who he says he is or that an individual's actions might not be what the average person would understand are benign ordinary actions." "As a result," he said, "especially given a background heavily laced with books involving magic—it would be very easy for a person so afflicted under stress in a fight to begin to perceive that people around him might ... be magical entities; might take action to protect themselves from perceived threats." Finally, he testified that in someone like Mr. Jackson, "with a diffusely defective brain

that is not functioning right[,] the ability ... to restrain would also be ... impaired so that it would be totally consistent for such an afflicted person in common parlance to lose it and not know what he was actually doing."

*Bethea* does not *require* that expert testimony on ultimate issues be allowed; it only allows it when appropriate and otherwise admissible, and the trial judge may as a matter of discretion decide the boundaries of appropriate testimony. *See supra* note 15. *Bethea* deemphasized, moreover, the actual language used by experts, in favor of giving jurors the most useful information to make their ultimate determination. We cannot say, then, that if the judge had decided he was not forced to prohibit ultimate issue testimony, he necessarily would have allowed the testimony defense counsel sought to elicit. Our "relaxed" standard for ultimate issue testimony is not without limits:

> As a practical matter, an exception to the ultimate issue rule exists where the helpfulness of the proffered expert opinion outweighs its prejudicial impact; to the extent admission is necessary to aid the jury, an invasion of the jury's province will be tolerated. Nevertheless, we find objectionable questions which, in effect, submit the whole case to an expert witness for decision.

*Lampkins*, 401 A.2d at 970; *cf. Burkhart v. Washington Metro. Transit Auth.*, 112 F.3d 1207, 1212 (D.C.Cir.1997) (noting that in the federal system "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact" in either "understanding the evidence or in determining a fact in issue" and thus is not

lacked the substantial ability to do X or Y." The judge's main concern appears to have been that the experts not "say that the Defendant ... [e]ither did or did not lack a substan-

tial capacity to recognize the wrongfulness of his conduct or that he ... either did or did not lack substantial capacity to conform his conduct to the requirements of the law."

"otherwise admissible" (alterations and internal quotation marks omitted)).

We thus cannot conclude that absent the error Dr. Blackmon's testimony concerning causation would have looked much different than it did at Mr. Jackson's trial. One of the questions defense counsel was kept from asking directly quoted part of the legal insanity standard, and two other prohibited questions essentially paraphrased the standard. A third prompted the judge to pose a narrower question to Dr. Blackmon, but then counsel withdrew it. Given that Mr. Jackson's expert took advantage of the same opportunity the government's experts were given to testify as to what effect Mr. Jackson's mental condition may have had on his actions on the day he killed his brother, we cannot say that the error here is reversible.

## D. Denial of Rebuttal Evidence

▉ Mr. Jackson next claims that the court abused its discretion in denying him the opportunity, in the criminal responsibility phase of his trial, to put Dr. Blackmon back on the stand to rebut some of the government experts' testimony. He argues that the judge was more concerned about the expense of calling the defense expert back for an additional day of testimony than about affording Mr. Jackson an adequate opportunity to rebut the government's case. We do not agree.

▉ We review the trial court's decision whether to allow rebuttal testimony for abuse of discretion. *Shelton v. United States*, 983 A.2d 979, 985–86 (D.C.2009). "Rebuttal evidence should be presented to refute, contradict, impeach or disprove the evidence that the adversary has already elicited." *Id.* at 986. The trial court may deny rebuttal testimony when it would merely repeat testimony from the party's case-in-chief. *See Owens v. United States,*

688 A.2d 399, 405 (D.C.1996); *see also Cooper v. Safeway Stores, Inc.,* 629 A.2d 31, 35 (D.C.1993) (In a civil case, the judge "may properly exclude as rebuttal testimony that which should have been introduced by the plaintiff in his or her case in chief ... [and] testimony ... cumulative of the case in chief." (internal quotation marks and brackets omitted)).

Following the government's case on the issue of insanity, defense counsel wanted Dr. Blackmon to testify in rebuttal on three issues that the judge rightly concluded he already had testified about. While the judge did mention the expense of bringing Dr. Blackmon back, he appeared more concerned that Dr. Blackmon would have repeated himself. He noted that the contrasting opinions of both sides' experts on all three subjects were "in front of the jury ... and I don't think that one side should just get to have the witness come back a second time and repeat ... the same opinion." He said that if the government had surprised the defense "or even if I thought you should have anticipated it but for some reason you didn't address it[,] I would exercise my discretion to let you bring it out ... but I just don't [think] that either of those conditions applies here."

The trial court thus denied rebuttal for valid reasons. And given that "[o]ur review of the trial court's decision in this regard is considerably deferential because of its superior vantage point during the course of the trial," *Shelton,* 983 A.2d at 986, the judge did not abuse his discretion.

## E. Second Amendment Challenge

Mr. Jackson last argues for reversal of his convictions on charges of possession of a prohibited weapon with intent to use it unlawfully against another (PPW),[17] carry-

---

**17.** The PPW violation, under D.C.Code § 22–4514(b), pertained to the shotgun and was · Count 7 of the indictment against Mr. Jackson.

ing a pistol without a license (CPWL),[18] and unlawful possession of ammunition (UA),[19] as well as two counts of possession of an unregistered firearm (UF).[20] Mr. Jackson was convicted of these offenses at a time when District of Columbia law made it impossible for him to register his handgun yet punished him for failing to have registered it. He claims these convictions violated his rights under the Second Amendment to the U.S. Constitution,[21] which "conferred an individual right to keep and bear arms." *District of Columbia v. Heller,* 554 U.S. 570, 594, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (finding unconstitutional D.C.'s total ban on handgun possession in the home, even for lawful purposes). We agree with him in part, and we remand for further proceedings on his convictions for carrying a pistol without a license (Count 6) and possession of an unregistered handgun (Count 8), to determine whether he could have qualified for registration of the pistol he possessed.

■■■■ We first reject the government's assertion that Mr. Jackson preserved only his challenge to the CPWL conviction because defense counsel explicitly mentioned only that charge when objecting on Second Amendment grounds. While it is true that counsel requested vacation of only the CPWL charge, her objection came after the trial court already had *sua sponte* raised the Second Amendment issue and considered its implications on all seven of Mr. Jackson's weapons charges. Immediately after counsel's objection, moreover, the judge—ruling pre-*Heller*—reiterated his conclusion that "under prevailing law in

the local D.C. courts, there is no [Second] Amendment issue relating to the charges of carrying a pistol without a license, possession of an unregistered firearm, possession of ammunition, [possession of a prohibited weapon], [or] any of these weapons offenses or ammunition offenses even in the home." It is clear that the judge was "fairly apprised as to the question[s] on which he [was] being asked to rule." *Hunter v. United States,* 606 A.2d 139, 144 (D.C.1992). He in fact ruled on those questions, and Mr. Jackson's challenge to all of his weapons convictions thus was preserved.

■■■■ After the Supreme Court's decisions in *Heller* and *McDonald v. City of Chicago,* —— U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), it is clear that the right to keep and bear arms extends to a person who possesses and carries a handgun in his or her home for self-defense. *See Heller,* 554 U.S. at 628–39, 128 S.Ct. 2783; *McDonald,* 130 S.Ct. at 3036 (noting that in *Heller* the Court concluded that the handgun is "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family" (internal quotation marks omitted)). While the precise protection the amendment affords beyond this core right remains unclear after *Heller,* we have concluded that *Heller* means it would be "impermissible under the Second Amendment to convict a defendant for possessing an unregistered handgun in the home when the District's unconstitutional ban made registration of a handgun impossible, unless the defendant was disqualified from registering the handgun for constitu-

---

18. The CPWL violation, under D.C.Code § 22–4504(a), was Count 6 of the indictment.

19. The UA violation, under D.C.Code § 7–2506.01, was Count 10 of the indictment.

20. The two UF violations, under D.C.Code § 7–2502.01, were counts 8 (the pistol) and 9 (the shotgun) of the indictment.

21. "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

tionally permissible reasons." *Magnus v. United States*, 11 A.3d 237, 242–43 (D.C. 2011) (citing *Plummer v. United States*, 983 A.2d 323 (D.C.2009)); *see also Herrington v. United States*, 6 A.3d 1237 (D.C. 2010) (extending this holding to a conviction for unlawful possession of handgun ammunition).

In *Plummer*, we applied this principle to a man convicted of CPWL and UF who was caught by police with a pistol outside his apartment. 983 A.2d at 326–27. Plummer, who had preserved his Second Amendment challenge in the trial court years before *Heller*, claimed in his "innocent possession" defense that he had found the pistol in an alley and intended to turn it over to the police. *Id.* at 329. Although the police found Plummer outside in public with the gun concealed in his pocket, he was acquitted of CPWL outside the home, D.C.Code § 22–4504(a) (2001), but convicted of the lesser-included charge of misdemeanor CPWL, under which there is no location provision. *See id.* at 325 n. 1, 341. Because we could not glean all of the dispositive facts from the record to decide his Second Amendment challenge, we remanded the case "with instructions to hold a hearing to determine whether, prior to the imposition of charges in [Plummer's] case, [he] would have been able to satisfy the then existing and applicable statutory and regulatory requirements for obtaining a registration certificate and license for his handgun." *Id.* at 342.

Later, however, in *Gamble v. United States*, 30 A.3d 161 (D.C.2011), we refused to vacate the CPWL conviction of a man convicted after police arrested him outside and found a pistol concealed in his pocket. *Id.* at 162. Gamble's case was still in the trial court when *Heller* was decided, and he moved to dismiss the charge in light of the decision. *Id.* at 162–63. The trial

judge denied his motion, concluding that "the Second Amendment did not protect appellant's possession of a firearm in a concealed manner in a public place." *Id.* at 163. On appeal, this court said that "when he argues that his conviction offends the Second Amendment, Mr. Gamble is necessarily asserting that an individual has the right to carry concealed firearms outside the home." *Id.* at 164. The court then held that because "there is no Second Amendment right to carry a concealed weapon," Gamble's "conviction for carrying a concealed pistol without a license on the streets of the District of Columbia did not violate his constitutional right to keep and bear arms." *Id.* at 164.

Although these two cases are distinguishable from each other on several grounds, we first note that they represent two ways of considering Mr. Jackson's Second Amendment challenge. Because we have repeatedly held that the CPWL and UF statutes remained facially valid after *Heller*, the issue here is whether the statutes were constitutionally applied to Mr. Jackson's conduct. *See, e.g., Plummer*, 983 A.2d at 339. The government argues, similar to the reasoning in *Gamble*, that it was not unconstitutional to convict Mr. Jackson of CPWL because he used the gun to commit a crime, an action that is not protected under the Second Amendment.[22] Mr. Jackson replies that the CPWL and UF statutes "are not concerned with the *use* of the improperly registered or licensed weapon" and thus *Heller* requires vacation or remand in accordance with *Plummer*.

Mr. Jackson's view of this case emphasizes the elements of CPWL and UF that required him to have registered the gun and obtained a license to carry it—acts made impossible by the District's unconstitutional ban on the registration of hand-

---

**22.** The government presumably would have made the same argument regarding the UF conviction if it had treated the issue as preserved.

guns. It thus seems relevant that if Mr. Jackson had been able, prior to his offenses here, to obtain a registration and license for his gun, the government would not have succeeded in charging him with CPWL and UF. If we assume Mr. Jackson, again prior to his convictions here, otherwise would have qualified for a registration and license, then the only reason Mr. Jackson was denied legal gun ownership was the handgun registration ban found unconstitutional in *Heller*. Thus this case would seem to be like *Plummer*, requiring a remand to find whether in fact there was some constitutionally permissible reason to prohibit him from having a handgun in his home.

On the other hand, the government would emphasize Mr. Jackson's broader conduct here. Mr. Jackson clearly was charged with committing a violent crime with the pistol, and the jury convicted him of all of the charges against him. Jurors' rejection of his self-defense claim cleared the way for his conviction on these charges based on his possession and carrying of the gun while he killed his brother. Thus, in arguing that his convictions on CPWL and UF in this case violated his Second Amendment rights, Mr. Jackson is, in the government's view, "necessarily asserting that an individual has the right" to carry a pistol while committing murder. *See Gamble*, 30 A.3d at 164. This assertion would obviously be wrong. *See Heller*, 554 U.S. at 629, 636, 128 S.Ct. 2783 (holding unconstitutional the "absolute prohibition of handguns held and used for *self-defense* in the home," which it referred to as a "core lawful purpose").

We agree with Mr. Jackson's view. The better way to consider this case is by acknowledging that as applied to him the CPWL and UF charges did not punish a particular use of the pistol beyond merely possessing and carrying it. There was no conduct requirement in either of the statutes that specified a prohibited use of the weapon; therefore all uses of the weapon, without a registration and license, were prohibited—not by D.C.Code § 22–4504 itself but by the combination of that provision and the one barring the registration of all handguns, § 7–2502.02(4), repealed following *Heller*. It is clear from the trial judge's ruling in *Gamble*, however, that the conduct being punished there actually was the defendant's concealed carrying of the pistol outside the home, not merely his having the gun on his person. *Gamble* was different from *Plummer* in that the appellant in *Plummer* was found not guilty of felony CPWL but guilty of misdemeanor CPWL, *see Plummer*, 983 A.2d at 314 & n. 20, while Gamble was charged with and convicted of the felony of carrying a pistol without a license outside the home or place of business, *see Gamble*, 30 A.3d at 162–63. In a recent case where the appellant had been convicted of CPWL for carrying a pistol outside the home, we noted that "CPWL is not a crime of omission." *Snell v. United States*, 68 A.3d 689, 693 (2013). "Although the absence of a license is an element the government must prove in CPWL prosecutions, the gravamen of the offense of felony CPWL is the act of carrying a pistol outside the home, not the failure to get a license." *Id.* We think, however, that when the defendant is convicted of so-called misdemeanor CPWL for carrying the pistol inside his home, as Mr. Plummer and Mr. Jackson were, the pivotal element of the crime is the absence of a license.[23] As the court in *Snell* noted, the

---

23. In addition, that Gamble was able to raise his *Heller*-backed Second Amendment challenge in the trial court meant that the judge was able to consider his conduct and compare it to the Supreme Court's ruling on the core of the amendment. Mr. Jackson was unable to have his conduct bearing on the CPWL and UF charges similarly circumscribed. The appellant in *Plummer* also had

CPWL statute has recently been amended to remove the license requirement language, *id.* at 691 n. 2, and now a valid gun registration allows the holder to carry the weapon "within the home." D.C.Code § 22–4504.01.

It is also telling, in reconciling this case with the holdings in *Plummer* and *Gamble,* that the CPWL statute, D.C.Code § 22–4504, on its face was addressed in part to any defendant who carries a pistol "concealed on or about their person," and "in a place other than the person's dwelling place." By contrast, it made no mention of how the defendant may use the gun. Statutes punishing people for the way they use a gun are easy enough to find elsewhere in the District's code. *See, e.g.,* D.C.Code § 22–4502(a) (PFCV statute, which punishes "[a]ny person who commits a crime of violence, or a dangerous crime ... when armed with ... any pistol or other firearm"); D.C.Code § 24–402 (increased punishment for crime of "assault with a dangerous weapon"). It did not matter for Mr. Jackson's convictions on CPWL and UF that he, in addition to possessing and carrying the pistol in his home, also committed a crime with it. What mattered was that Mr. Jackson had not registered his handgun and did not have a license to carry it. Mr. Jackson was prohibited—potentially unconstitutionally—from legally possessing and carrying a handgun inside his home for *every* reason, and yet his failure to make his gun possession legal is precisely what he was punished for. The only way to know whether Mr. Jackson was in fact unconstitutionally deprived of legal ownership of a pistol, however, is to remand the case as the *Plummer* court did.

This result is not inconsistent with our prior case of *Howerton v. United States,*

964 A.2d 1282 (D.C.2009). In that case, this court held that it was not plain error to convict someone pre-*Heller* of CPWL and UF where the person had possessed a gun in his home but used it to commit the separate crime of assault with a dangerous weapon. *Id.* at 1287–89. In that case, the focus was on whether the trial court, in the absence of an objection from the defense, should have refused to convict Howerton on Second Amendment grounds. *Id.* The court concluded that any error was not plain because the jury had found him guilty of assaulting his girlfriend with the pistol and "no evidence was presented that he possessed the gun for purposes of self-defense." *Id.* at 1287. The court in *Howerton,* however, did not need to decide the issues raised by Mr. Jackson, who preserved his Second Amendment challenge.

Mr. Jackson's convictions on Count 7(PPW), Count 9 (possession of an unregistered shotgun), and Count 10(UA)—all of which either expressly in the indictment or implicitly under the facts of the case pertained at least in part to the shotgun—are not affected by the Second Amendment holding in *Heller,* or our cases applying that holding to people convicted under the District's pre-*Heller* registration scheme. Those cases concern only the limited right to possess a handgun. The UF-shotgun and UA convictions must stand because Mr. Jackson in fact could have registered the shotgun under then-existing District law. *See* D.C.Code § 2502.02 (2001) (shotgun not included in list of firearms for which "a registration certificate shall not be issued"); *cf. Parker v. District of Columbia,* 478 F.3d 370, 373–74 (D.C.Cir. 2007) (considering Second Amendment challenge to D.C. gun laws from woman who "owns a registered shotgun, but

been unable to present his *Heller* argument in the trial court, which may be another reason the court felt it necessary to remand that case

even though it was faced, like the court in *Gamble,* with a defendant caught carrying a concealed weapon outside the home.

wishes to keep it assembled and unhindered by a trigger lock or similar device").

We also affirm Mr. Jackson's conviction for possession of a prohibited weapon. PPW in violation of D.C.Code § 22–4514(b)[24]—unlike CPWL, UF, and UA—is not a crime of mere possession, and it has no registration requirement. It did not matter for this conviction whether Mr. Jackson registered or was qualified to register the shotgun. The crucial element of the crime was instead Mr. Jackson's "intent to use [the shotgun] unlawfully against another." Jurors decided he had that intent when they rejected his self-defense claim and convicted him of PPW and other violent crimes. The Supreme Court in *Heller*, which emphasized people's right to keep arms in the home for self-defense, did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." 554 U.S. at 595, 128 S.Ct. 2783. It thus was constitutional to apply the PPW statute to Mr. Jackson's conduct in this case.

### III. Conclusion

While there was a high risk of prejudice to Mr. Jackson at numerous turns during his long and procedurally complex trial, we hold for the foregoing reasons that the trial judge neither abused his discretion nor made any decision that actually prejudiced Mr. Jackson's defenses. We find it necessary, however, to remand this case on Counts 6 and 8 of the indictment for a hearing in line with *Plummer*, "to determine whether, prior to the imposition of charges in this case," Mr. Jackson "would have been able to satisfy the then existing and applicable statutory and regulatory re-

quirements for obtaining a registration certificate and license for his handgun." *Plummer*, 983 A.2d at 342.

*So ordered.*

---

24. "No person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than 3 inches, or other dangerous weapon." D.C.Code § 22–4514(b) (2001).